THE FIRST NATIONAL BANK OF CHARLOTTE *v.* DAVID A. JENKINS, Treasurer, and THE WILMINGTON, CHARLOTTE & RUTHERFORD RAILROAD COMPANY.

A plaintiff can appeal from a decision of a Judge at Chambers refusing an injunction.

Where property is conveyed to the State by one for whom it has become surety, in order to indemnify it against the risk incurred, the State becomes a trustee of such property for the benefit of the creditor, also, and so, cannot do any act calculated to impair the security.

Where a State becomes surety, (*here,* by an endorsement of the bonds of a Railroad Company,) the equities arising to the creditor out of any contract for indemnity of the State by the principal debtor, are as much entitled to protection, as would be any rights directly created by a contract between the creditor and the State.

Whether equitable obligations assumed by a State as a trustee can be enforced indirectly through the process of an injunction against the Treasurer of the State:   *Quære?*

Where the State authorized a Railroad Company to issue bonds to the amount of $2,500,000, secured by a first mortgage of its property, and further engaged to *endorse* $1,000,000 of such bonds, provided that the Company would deposit with the Treasurer of the State $500,000 other of such bonds, as an indemnity against its paying principal or interest upon those which it had endorsed: *Held,* that a creditor who owned

---

BANK OF CHARLOTTE *v.* JENKINS and R. R. Co.

---

some of the endorsed bonds could not be said to be either injured or damaged by subsequent legislation providing that the $500,000 should be surrendered to the Company, to be used in constructing and completing its road and not otherwise.

By PEARSON, C. J., (*concurring.*)

1. The facts stated above in regard to the State the Company and the creditor, create no *contract* between the State and the creditor.

2. The equities between a creditor and a surety in cases like the above, (*Wiswall* v. *Potts*, 5 Jon. Eq., 184) require that the surety, as well as the creditor, shall be insolvent; so that the attempted change of disposition involves the idea of a *fraud*; and *that* no Court can attribute to its sovereign.

3. Where the facts (as *here*) put aside the question of the *constitutionality* of the Act, a Court cannot enjoin an officer of the State from doing something directed to be done by the Legislature, upon the ground that such transaction will injure the plaintiff; (*University R. R. Co.* v. *Holden*, 63 N. C., 410.)

MOTION for an injunction, before *Pearson, C. J.*, at Chambers in Yadkin County, April 27th 1870.

The complaint, filed in WAKE Court, set forth that:

1. By an act ratified Dec. 20th 1866, the Company defendant was authorized to issue bonds not to exceed $4,000,000, for the security of whose holders it might execute a mortgage, conveying its franchise, &c., which should be a *first* mortgage,—a previous loan in favor of the State to be postponed, and made a second mortgage;

2. By an ordinance of the Convention ot 1868, passed Feb. 5th 1868, upon a surrender of $1,500,000 of the above bonds, the State would endorse $1,000,000 of the remainder thereof: *provided* that $500,000 in other bonds of such remainder should be deposited with the Treasurer of the State, as collateral security for it on account of such endorsement; and if the Company should fail to pay either the principal or interest of said endorsed bonds, so that the State should become liable for, and should pay the same, then the State

BANK OF CHARLOTTE *v.* JENKINS and R. R. Co.

should become the owner of said $500,000, but if the Company should pay both principal and interest, they should be the property of the Company;

3. Under the above provisions the Company issued $2,000,000 in bonds (besides the $500,000) and executed the mortgage as aforesaid, and obtained the endorsement of the State for $1,000,000 of the $2,000,000 issued and secured as above;

4. The $500,000 were also deposited as required, for an indemnity, &c.;

5. Of the bonds endorsed by the State, $50,000 has come to the hands of the plaintiff as purchaser, for value, &c.;

6. By an act ratified March 12th 1870, the Treasurer is directed to re-deliver to the said Company the above $500,000, (in exchange for a like amount of certain State bonds) to be by it applied to the construction and completion of the road; and the Company is about to demand, and the Treasurer to deliver, them accordingly;

7. The plaintiff is advised that as holder of the said $50,000, it is interested in the security held by the State by having the $500,000 in hand as an indemnity; and is also interested that the fund secured by the mortgage shall not be increased by placing the $500,000 in market; and, therefore, that the act of March 12th 1870, is, as regards it, unconstitutional and void;

8. That the estate conveyed in the mortgage is insufficient to secure the debt provided for; that the Company is insolvent; and that the *power* which the plaintiff has over the fund held by the State in trust, as above, is superior to that of *enforcing* payment from the State itself, and that this advantage is one of which he cannot be deprived by adverse legislation;

9. The judgment demanded, was that the Treasurer should be enjoined from delivering the $500,000, or any part

thereof; and that the Company and its agents, &c., should be enjoined from receiving the same.

Upon application to his Honor, Judge Henry, at Chambers, in Raleigh, on the 17th of March 1870, he granted a restraining order until the motion should be decided, and a further order, that the defendants should show cause before Chief Justice Pearson, at Chambers, in Yadkin County, upon the 7th day of April, why the injunction should not be continued until judgment, &c.

There was a miscarriage in regard to the appearance upon the 7th of April, and thereupon, his Honor the Chief Justice postponed the hearing until the 27th day of April, at which time the motion was argued before him at length, by counsel upon both sides.

His Honor made the following order:

It is thereupon considered by me, that the motion be refused, and that the defendants recover the costs of the motion.

The plaintiff having asked to be allowed to appeal, his Honor added:

The plaintiff is entitled to an appeal. The injunction in this case is not ancillary to some primary equity, as a provisional remedy, but is itself the primary right demanded, viz: an injunction, in the first instance, until the hearing, and then, to have it made perpetual; and it rests on the right to be protected from irreparable injury. Consequently, an order refusing the injunction puts an end to the case. The effect of the appeal is, to vacate the order refusing the injunction; and the order of restraint made by his Honor, Judge Henry, remains in force until the motion for an injunction is disposed of by the Supreme Court;

This being an appeal from a ruling at Chambers, does not

fall under the regular course of the docket, but will be called on the second day of the next term.

The plaintiff appealed.

*Phillips & Merrimon*, for the appellant.

1. Any fund given by a principal debtor, (*here*, the Company,) to his surety, (*here*, the State,) in order to indemnify the latter against the risk incurred by the relation between them, enures to the benefit of the creditor, (*here*, the Bank); and no consent by the two former parties to abolish the indemnity, can prevail if the third party disagree. An act of Assembly allowing such new arrangement, against the will of the creditor, impairs the obligation of the contract. The State took the $500,000, charged with a trust to the Bank, and a trust is a *contract*, within the meaning of the Constitution of the United States : *Wiswall* v. *Potts*, 5 Jon. Eq. 184 ; *Blalock* v. *Peck*, 3 Jon. Eq. 323, Burge, Surety. 324 ; *Wright* v. *Baseley*, 11 Ves. 12, 21 ; *Keys* v. *Brugh*, 2 Paige, 311 ; *Mouse* v. *Harrison*, 1 Abr. Eq. Cas. 93 ; *Moses* v. *Murgatroyd*, 1 Jon. C. 119 ; *Nelson* v. *Bright*, 1 John. 205, 2 John. C. 418.

2. This is especially true *here*, where the plaintiff can, by suit, *enforce* his rights against the fund, although he cannot against the surety: *Curran* v. *Arkansas*, 15 How. 305 ; *Briscoe* v. *Bank of Kentucky*, 11 Pet. 311 ; See *Hunter* v. *U. S.*, 5 Pet. 173 ; *Bank of U. S.* v. *U. S.*, 2 How. 711, 2 Story, Const., secs. 1391, 1392 ; *Woodruff* v. *Trapnall*, 10 How. 190 ; *Hawthorne* v. *Calef*, 2 Wall. 10, Cooley, Const. Lim. 277 ; *Town of Pawlett* v. *Clark*, 9 Cranch, 292 ; *Terrett* v. *Taylor*, Id. 43 ; *Montpelier* v. *East Montpelier*, 29 Vt. 12, 1 Kent. Comm. 463 ; *Hoffman* v. *The City of Quincy*, 4 Wall. 535 ; *Dodge* v. *Woodsey*, 18 How. 331.

3. Even if the State cannot be enjoined, its agents may,

as, *here,* the Treasurer : *Osborne* v. *U. S. Bank,* 9 Wheat. 738 ; *Curran* v. *Arkansas,* and *Dodge* v. *Woolsey, supra.*

4. A State may become a trustee. The English authorities, where they are to the contrary, go upon the view, that the sovereign can act in his sovereign capacity only. In the United States, it is accepted that the sovereign may put off his sovereignty, i. e. as member of a corporation, or as a trader. The rule seems to be, that if a State choose to appear in the guise of a trader, it must submit to be bound by the beneficent rules, (*uberrima fides,*) of the mercantile law. It cannot, in its sovereign capacity, by the mouths of its Judges, lay down a rule for its citizens, which, in its *quasi* private capacity, when trading itself, it will not be bound by to the full. If it be a surety, as here, it takes upon itself all the qualities and incidents of the relation. Its example is to tally with its precepts. See 1 Green. Cruise, 385, 431, and n.; *Kildare* v. *Eustace,* 1 Vern. 412 ; *Penn* v. *Lord Baltimore,* 1 Ves. Sr. 444, Saund. U. and T. 349 ; *Pinson* v. *Ivey,* 1 Yerg. 296.

*Guion, contra.*

1. The plaintiff states that the trust set up by it is only " indirect," and not express : As the State is not bound by *Statutes* which do not act upon it *expressly,* so also, it is not by trasactions : Bac. Abr., Prerog. 5 ; *Charles River Bridge* v. *Warren Budge,* 11 Pet. 552 ; *U. S.* v. *Arredondo,* 6 Pet. 738 ; *State* v. *Garland,* 7 Ire. 48 ; *McRee* v. *Wil. & Ral. R. R.* 2 Jon. 186 ; *State* v. *Manuel,* 4 D. and B. 33, 2 Sto. Eq. sec. 1195.

2. The doctrines which affect ordinary persons who fill certain relations of business, &c., have no place in regard to the State, or sovereign, when holding such relations : Bac. Prerog. 1 ; *Taylor* v. *Shuford,* 4 Hawks, 133 ; *Candler* v. *Lunsford,* 4 D. and B. 408 ; *Wallace* v. *Maxwell,* 10 Ire. 112.

3. The State cannot be a trustee: *Cook* v. *Fountain*, 3 Swanst. 585.

4. If the State be decreed a trustee, it has, of course, the *privileges* of a trustee ; one of which is that of making prudent investments of the trust funds, at his discretion ; as, *here*, by an investment for the completion of the road, and the consequent enhancement of all its property. Lewin, Trusts, 413 ; *Massey* v. *Bonner*, 1 Jac. and Walk. 241.

RODMAN, J. A question is made in this case as to the right of a plaintiff to appeal from a decision of a Judge, or of a Justice of this Court, sitting at Chambers, refusing an injunction. We think the right is clearly given by section 299, C. C. P., and we can see no inconvenience in its exercise.

2. As to the principal question :

The plaintiff contends that by virtue of the contract between the State and the Company, contained in the ordinance of 1868, the State became a trustee of the property conveyed to it under that ordinance, to wit : of the road and of the half million of the bonds of the company; not only for the indemnity of the State as the endorser for the company of a million of its bonds, but also for the benefit of all the holders of such bonds ; and that consequently it cannot, in good faith, do any act calculated to impair the security. The general principle is admitted. And although there was no direct contract between the State and the plaintiff, (except, of course, the endorsement,) it is conceded that any equities arising to the plaintiff as a creditor, out of the contract between the State and the company, are as much entitled to protection as would be any rights directly created by a contract between the plaintiff and the State. In the view which we take of this case, it is not necessary to consider whether

equitable obligations assumed by a State as a trustee, can be enforced indirectly through the process of an injunction against the State Treasurer : we avoid the expression of any opinion on that point, but for the sake of the argument we assume that they may. The only remaining question is, whether the act sought to be enjoined is in violation of any contract implied between the State and the plaintiff, or of any equity arising on behalf of the plaintiff out of the contract between the State and the defendants, contained in the ordinance of 1868. If it is not, although the plaintiff may be damaged by the threatened act, he cannot, in a legal sense, be injured. The act sought to be enjoined is the delivery to the company of the half million of its bonds which were deposited with the State under the ordinance of 1868, to be negotiated for its benefit.

Two ways are suggested in which the plaintiff will be damaged by this act :

I. It is said that the fund provided for the security of his debt will be diminished, by withdrawing from it this half million of bonds : and, for example, it is said that if the road shall be sold under the mortgage, and bring less than two millions, the plaintiff and other like creditors, through the State as their trustee, would be entitled, in the distribution of the proceeds, to a share, in the proportion of a million and a half to the million of the notes not endorsed by the State.

This view regards the half million of bonds as property, as a real value, which it seems clear to us, as long as they remain unnegotiated and in the hands of the State, they are not. For this half million of bonds the State has given no consideration ; they do not represent a debt to the State, actual or contingent ; they have not been delivered to the State as bonds ; they are simply in the nature of the penalty of a bond, which does not increase the real obligation. The only debt to the State, (we may speak of it as a debt,

although it is in fact only a liability,) is, for the million of bonds endorsed by it; and the company by procuring the holders of those bonds to release the State, would be immediately entitled to receive the half million of its bonds. To such a distribution of the assets of the company as that suggested in the event supposed, the holders of the million of bonds not endorsed by the State, but secured in the mortgage equally with those so endorsed, might reasonably object: it would be inequitable for the State to prove for an amount exceeding its liabilities; in a common risk, equality is equity. It may here be asked if this be the true construction of the contract, what purpose was intended to be answered by the deposit of this half million of bonds. The question is pertinent, and an answer will be attempted in the course of this discussion.

II. It is said that the plaintiff will be damaged by the negotiation of the half million of bonds, in that the debt secured by the mortgage will be increased, and hence, in the event supposed, of the insolvency of the company, the *pro rata* share of the plaintiff will be diminished. The suggestion is opposed to the former one, which considers the mortgage debt to be two millions and a half, whereas this properly regards it as being, until the negotiation of these bonds, only two millions. It is admitted that the negotiation of these bonds may be a damage to the plaintiff in the way suggested; and if the whole debt contemplated by the mortgage, both prospective and existing, was only two millions, we are prepared to concede that the increase would be inequitable and injurious. The equities claimed by the plaintiff can arise only out of this construction of the ordinance. But it seems to us clear, on the face of the ordinance, that the intention in depositing these bonds, was, that they might be negotiated in some contingency. No other reasonable purpose can be suggested, and this is our answer to the inquiry above, which

was deferred. Unless they were to be negotiated, their existence could answer no useful purpose whatever; in the hands of the State they were without vitality. The plaintiff therefore, although he might be damaged by such negotiation, could not be injured, as it is consistent with the contract which he knew of and assented to, when he purchased his bonds.

The plaintiff, however, says that although it was agreed that the State might negotiate these bonds, yet it can only do so in the event of a default of the company in the payment of interest, and the proceeds of the sale must be applied *exclusively to pay the interest of the bonds endorsed by the State.* We think this the most serious question in the case. But upon consideration of the whole contract between the State and the company, we are led to the conclusion that it was not the intention to tie up the power of the State over these bonds so narrowly, but that a discretion was left to it to use them in any way not injurious to the creditors secured by the mortgage.

*In the first place,* it is not said expressly, or, as far as we can see, by a reasonable implication, that the proceeds of the half million of bonds is to be appropriated in the way claimed. They are deposited with the State as a collateral security for its endorsement, " and if the company shall fail to pay either interest or principal of said endorsed bonds, so that the State shall become liable for the same, then the State shall become the owner of the said five hundred thousand dollars of bonds :" but if the company shall pay the bonds endorsed by the State, the half million of bonds shall be the property of the company. It does not appear that the State has yet paid any thing for the company, nor is it material that it should appear. It is not easy to see what precise rights the Convention supposed would arise from the deposit of these bonds. It could not be that in the event of the insolvency of the

company and a failure of its assets, the State was to prove as a creditor for half a million more than was owing to it, or than it was bound for. The injustice of this to other creditors in the event supposed is so obvious, that we cannot attribute such a purpose to the Convention. But, in any event the half million were to be the property either of the State or of the company; they were regarded as a part of the debt secured by the mortgage, and this they could not be so long as they remained in the hands either of the State or of the company; they had no existence as a debt until they were negotiated, and the expectation plainly was that they should be negotiated, under circumstances not clearly described, and probably not clearly foreseen.

*Secondly,* the holders of the million of bonds secured by the mortgage, but not endorsed by the State, might truly allege that to sell the half million of bonds and apply the proceeds to pay the interest of the endorsed bonds, would be disadvantageous to them, as enlarging the principal of the mortgage debt for the exclusive benefit of the holders of the endorsed bonds. We are not prepared to say that this application of the half million of bonds would be inequitable, because it probably was one of the modes in which it was contemplated in the ordinance that they might be used: but we think it was not the only one, and that the State and the company might agree to any other application not expressly or impliedly forbidden by the ordinance. The act of 1870 gives the bonds to the company, to be negotiated by them, and the proceeds to be expended in the construction of the road. This application does not impair, but may increase the security of the mortgage creditors: it is neither expressly, nor, so far as we can see, by any probable implication, forbidden by the ordinance of 1868, but we think was contemplated, as possible, by that ordinance. We do not see that the plaintiff is damaged—much less injured—by this

application. We think, therefore, the injunction was properly refused; the restraining order is also dissolved.

The defendant will recover costs.

PEARSON, C. J. In forming the opinion at Chambers that the motion for an injunction should be refused, I had the aid of a full argument by counsel on both sides. The argument at bar has tended to convince me more clearly of the soundness of that conclusion.

The motion is put on the ground that the act of the General Assembly directing the Public Treasurer to deliver to the Railroad Company the half million of bonds deposited for the indemnity of the State, on receiving a like amount of the State, is unconstitutional :

1. It violates the Constitution of the United States, in this, it impairs the obligation of a contract.

There is no contract, express or implied, between the State and the Bank in respect to this half million of bonds. The contract was between the State and the Railroad Company: That the Company should issue two and a half million of bonds only, secured by a first mortgage of the Road, &c.; the State should guaranty the payment of one million; and, to indemnify the State, half a million of the remaining bonds should be deposited with the Public Treasurer. The Bank was no party to this contract. The only contract between the State and the Bank grows out of the fact that the Bank holds $50,000 of the bonds guaranteed by the State. There is no allegation of a violation of the contract of guaranty. So the Constitution of the United States is out of the question.

2. It violates the Bill of Rights, in this, it deprives the Bank of a " vested right." In support of this position, it is said that by the purchase of the bonds the relation of *creditor and surety* was established between the Bank and the State, and

BANK OF CHARLOTTE *v.* JENKINS and R. R. Co.

that by a settled doctrine of equity, the creditor acquires a vested right in the indemnity fund held by the State.

It is an admitted doctrine of equity, that a creditor is entitled to the benefit of a fund put by the principal debtor in the hands of a surety for his indemnity. This doctrine of the Courts of Equity is a very refined one; the principle on which it rests is not clear. It is not put on the ground of contract, for for there is no contract between the creditor and surety in respect to the fund. A, in order to induce B to become his surety on a debt to C, puts a horse in the hands of B, for his indemnity; there is no contract between B and C in respect to the horse, and so far as C is concerned, it is difficult to see why B may not sell the horse, or, if he choose to surrender the indemnity, and give the horse back to A; that is, provided B is *solvent* and fully able to pay the debt; for if B is insolvent and is about to make way with the fund, it is a *fraud* on C which the Court will prevent, by converting B into a trustee of the fund for the benefit of C. In the latter case the equity is clear, but in the former I confess my inability to see any ground on which an equity can rest. If the surety be not insolvent, how does it concern the creditor what he does with the indemnity fund?

This point was called to the attention of the learned cousel who argued for the motion at Chambers, and he was requested by me to look into the books, and aid the Court upon the argument at Bar, by tracing out the principle so as to show from the authorities, whether the equity is put on the ground of contract, or of fraud. On the argument at bar, no case was referred to touching this point, and without looking through the books, on reflection and general reasoning I feel satisfied that it rests on the ground of preventing fraud, and is worked out by converting the surety into a trustee of the fund for the benefit of the creditor.

*Wiswall* v. *Potts*, 5 Jon. Eq. 184, was relied on in the

argument at Chambers, but was not cited in the argument at bar, for the reason, I presume, that it was found not to be in point. In that case, a debtor in failing circumstances, made an assignment to a trustee, for the *indemnity* of certain of his sureties; the trustee sold the property, and the question was, should he pay the proceeds of sale over to the sureties, or pay it to the creditor in satisfaction of the debt, the Court held, that it must be paid to the creditor, for, inasmuch as the debt constituted the consideration which upheld the deed of trust and saved it from being void as against creditors, by its proper construction, the legal effect of the deed was to vest the property in the trustee, to be sold, and the proceeds of sale applied to the *discharge of the debt*, for the indemnity of the sureties; there being by the construction of the Court, an express trust. The creditor had, of course, a right to enforce it, so it was not necessary to resort to the refined doctrine of converting a surety into a trustee of the indemnity fund, to prevent fraud.

In our case, to say nothing of the fact that there is no allegation of the insolvency of the surety, to-wit: the State, and admitting that a sovereign may, by express agreement, become a trustee, (although there might be difficulty in enforcing even an express trust,) I am not able to see any principle upon which a Court can undertake to declare that its sovereign is about to commit a fraud and, to prevent the supposed fraud, prohibit any disposition of the fund which the sovereign sees fit to make. No case was cited to show such an equity against the sovereign. The equity is a creation of the Court, and it never has been recognized where the sovereign is concerned. It follows that there is no such equity against the sovereign. A distinction was taken in the argument at Chambers, between a sovereign who is a natural person, like Queen Victoria, and a mere ideal sovereign, as the State of North Carolina, but no authority was cited to

support it. It must be taken then, that the bank, in purchasing bonds guaranteed by the State, knew that it acquired no vested right in the bonds deposited for the indemnity of the State, and relied solely upon the ability of the Railroad Company and of the State, and the mortgage on the Road, &c. The bank having no vested right in the indemnity fund, the Bill of rights is out of the question.

3. It is said, the bank will be injured by the delivery of these half million of bonds to the Company. That is not clear to my mind: The ability of the surety, the State, to meet the guaranty, will be increased by getting in a half million of its bonds to be cancelled, and thereby lessen the public debt. The ability of the principal debtor, the Rail Road Company, will be increased by having those bonds to dispose of, and the mortgage fund will be enhanced in value, by having the proceeds of these bonds applied to the completion of the Road, which is an express provision of the act. On the other hand, it is true, that a larger amount of the bonds of the Rail Road Company will be put in market, but the act by which the State agrees to guarantee one million of the bonds and requires the deposit of half million as an indemnity, expressly provides that the mortgage shall include the whole two and half millions of bonds. Surely the bank cannot expect the State to cancel these bonds for its benefit, or keep them locked up in the vaults of the Treasury.

But, suppose the bank may be prejudiced if these bonds are delivered to the Rail Road Company ; this Court has no power, on that ground, to direct an officer of the State, not to obey an act of the General Assembly. We have held that the Court has the power, and will exercise it, to forbid any officer of the State, from executing an unconstitutional act of the General Assembly : *University R. R. Co.* v. *Holden,* 63 N. C. 410. But when the act is not unconstitutional, the Courts have no power to interfere.

So, the whole question turns upon the unconstitutionality of the act, and that has been disposed of.

I concur with the other members of the Court.

PER CURIAM.                              Injunction refused.