JAMES H. POU BAILEY, A. PILSTON GODWIN, HARRY L. UNDERWOOD, HENRY L. BRIDGES, ROSALIE T. ADAMS, JESSE M. ALMON, HELEN L. ANDREWS, WORTH B. SKEW, BILLY A. BAKER, PARKER N. BARE, ARTHUR C. BEAMAN AND GRACE G. BEAMAN, JOSEPH G. BINKLEY, ROBERT L. BLEVINS, ELLIE L. BOYLES, CHANCEL T. BROWN AND JOAN W. BROWN, ELIZABETH S. BUTLER, DOROTHY T. CARMICHAEL, JOHN CARRICKER, HAROLD D. COLEY, SR., ANNA L. COOPER, CHARLES C. COOPER AND BERTIE S. COOPER, T.J. DUNCAN AND ESTHER P. DUNCAN, DAN R. EMORY, MARTIN W. ERICSON, FRED W. GENTRY, IVEY B. GORDON AND IZORIA S. GORDON, LOUIS N. GOSSELIN, EARL T. GREEN, BOB HAMMONS, DARIUS B. HERRING, RAY F. HOLCOMB, TILLE M. HOLCOMB, KAY C. HURT, JOHN I. KIGER AND MARIE K. KIGER, CLARENCE T. LEINBACH, WALTER G. LEMING AND BARBARA C. LEMING, YATES LOWE, HARRIETTE B. McCORMICK, VIRGINIA H. MICKEY, WILLIAM F. MORGAN, HARRIETTA B. McCORMICK, EARL RAY PARKER, CALVIN C. PEARCE, MICHAEL PELECH, DIANE S. PEOPLES, MILDRED R. POINDEXTER, WINNIE D. POTTS, PATSY M. REYNOLDS, GLENN D. RUSSELL, BLANCHE S. SHIPP, CLYDE R. SHOOK, HAROLD E. SIMPSON, SONNIE B. SIMPSON, LENORA S. SMITH, FRANCES J. SNOW, CHARLES A. SPEED, JUSTUS M. TUCKER, WALTER P. UPRIGHT, RALPH B. WALKER AND MARTHA M. WALKER, JEAN A. WATSON, ROBERT I. WEATHERSBEE, RUBY WEBSTER, HARRY LEE WILLIAMS, DANIEL W. WILLIAMS, ELIZABETH H. WILSON, WILBUR G. WILSON, ERNEST B. WOOD,

## BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

THOMAS S. WORSHAM, INDIVIDUALLY FOR THE BENEFIT AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PETITIONER-PLAINTIFFS AND W.K. AUBRY, JR., JAMES BRYAN BARRETT, NORMAN W. CASH, ROBERTA M. COOK, JOHN ED DAVIS, DANIEL M. DYSON, EDWIN C. GUY, SAMUEL L. HARMON, JOHN MARSHALL HARTLEY, DONALD ELLIOT HARTLE, MARTHA M. LAWING, DOUGLAS LAMAR MASON, DELMA DALTON RESPASS, JR., WILLIAM ELMER RIGGS, PAUL L. SALISBURY, JR., RICHARD A. SHARPE, NELSON LEROY SHEAROUSE, FRANCIS C. SIMMONS AND MARY E. SIMMONS, NED RAEFORD SMITH, G. VANCE SOLOMON AND EULALIA T. SOLOMON, THOMAS LASH TRANSOU AND WILBUR EUGENE YOUNG, ADDITIONAL PETITIONER-PLAINTIFFS v. STATE OF NORTH CAROLINA, THE NORTH CAROLINA DEPARTMENT OF REVENUE, JANICE FAULKNER, IN HER CAPACITY AS SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF REVENUE, THE NORTH CAROLINA DEPARTMENT OF STATE TREASURER, HARLAN E. BOYLES, IN HIS CAPACITY AS TREASURER OF THE STATE OF NORTH CAROLINA, RESPONDENT-DEFENDANTS

No. 53PA96

(Filed 8 May 1998)

1. **Retirement § 4 (NCI4th)— state and local government employees—retirement systems—contractual relationship—benefits exempt from state taxation** .

   The relationship between the retirement systems for state and local government employees and employees vested in the systems is contractual in nature. Furthermore, the right to retirement benefits exempt from state taxation is a term of such contract where the evidence showed the creation of various statutory tax exemptions by the legislature, the location of those provisions alongside the other statutorily created benefit terms instead of within the general income tax code, the frequency of governmental contract making, communication of the exemption by governmental agents in both written and oral form, use of the exemption as inducement for employment, mandatory participation, reduction of periodic wages by contribution amount, loss of interest for those not vesting, establishment of a set time period for vesting, and the reliance of employees upon retirement compensation in exchange for their services.

2. **Taxation § 22 (NCI4th)— state and local government retirement benefits—exemption from taxation—not contracting away of taxing power**

   The state tax exemption for state and local government retirement benefits does not constitute a contracting away of the State's sovereign power of taxation in violation of Art. V, § 2(1) of

BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

the North Carolina Constitution. When subsection (1) of Art. V, § 2 is considered with subsections (3), (6), and (7), it is clear that the State may make contracts for exemptions without contracting away the power of taxation as long as the contract is for a public purpose, and the exemption was for a public purpose in that it helped attract and keep quality public servants despite the generally higher wages paid in private employment.

3. **Constitutional Law § 143 (NCI4th); Retirement § 4 (NCI4th)— retirement benefits—state and local government employees—cap on state tax exemption—impairment of contract**

The 1989 legislation which placed a $4,000 annual state tax exemption cap on retirement benefits received by state and local government employees impaired the contractual rights of employees whose retirement benefits had vested prior to passage of the legislation to a tax exemption for those benefits in violation of Art. I, § 10 of the United States Constitution.

4. **Constitutional Law § 143 (NCI4th); Retirement § 4 (NCI4th)— retirement benefits—state and local government employees—cap on state tax exemption—not necessary for important public purpose**

Although the 1989 legislation which placed a $4,000 cap on the state tax exemption for retirement benefits received by state and local government employees was passed in response to a U.S. Supreme Court decision holding that federal retirees had to be treated the same as state and local retirees, the impairment of contracts caused by this legislation was neither reasonable nor necessary for achieving an important state interest since there are numerous ways in which the State could have complied with the decision without impairing any contract rights, including the exemption of federal benefits or application of the exemption cap prospectively only to those state and local employees whose retirement benefits had not yet vested. Therefore, the 1989 legislation was not an exercise of the police power or other means under which the State may legitimately skirt the mandate of the Contract Clause of Art. I, § 10 of the United States Constitution.

BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

5. **Constitutional Law § 110 (NCI4th); Retirement § 4 (NCI4th)— retirement benefits—state and local government employees—cap on state tax exemption—taking without just compensation**

The 1989 legislation which placed a $4,000 annual state tax exemption cap on retirement benefits received by state and local government employees constituted a taking without just compensation of the property of employees whose retirement benefits had vested in violation of the Fifth Amendment to the United States Constitution and Art. I, § 19 of the North Carolina Constitution where the employees had contracted, as consideration for their employment, that their retirement benefits, once vested, would be exempt from state taxation. U.S. Const. amend. V; N.C. Const. Art. I, § 19.

6. **Taxation § 219 (NCI4th)— retirement benefits—state and local government employees—income taxation—injunction improper—harmless error**

The trial court erred by enjoining the collection of income taxes on state and local government retirement benefits pursuant to the 1989 legislation which placed a $4,000 state tax exemption cap on those benefits since N.C.G.S. § 105-267 is the relevant statute for challenging the legislation, and the only relief granted under this statute is a refund of improperly collected taxes. However, this error was not prejudicial where the trial court immediately stayed the injunction pending appeal; the trial court determined that plaintiffs would still be required to file refund suits for years not covered by the present litigation; and the N.C. Supreme Court has determined in this appeal that the 1989 legislation is unconstitutional as applied to employees whose benefits vested prior to its passage so that the State will be prevented from further attempts to collect taxes on the benefits of those employees.

7. **Costs § 29 (NCI4th)— class action—refund of income taxes on retirement benefits—common fund for attorney fees and costs**

In a class action in which it was held that the 1989 legislation which partially taxed state and local government retirement benefits was unconstitutional and that retirees whose benefits had vested are entitled to recover income taxes paid on those benefits by refunds or credits, the trial court did not err by ordering

that fifteen percent of the refund or credit amount for each class member be paid to a common fund for the payment of the representative plaintiffs' attorney fees and other costs and expenses. The recovery in this case constitutes a common fund for purposes of shifting attorney fees under the common fund doctrine.

**8. Taxation § 216 (NCI4th)— retirement benefits—unconstitutional tax statute—refunds—compliance with protest statute not required**

Where it was determined that the 1989 statute which placed a $4,000 annual state tax exemption cap on retirement benefits received by state and local government employees unconstitutionally impaired contractual rights and constituted a taking of property without just compensation, the trial court erred by ordering that refunds be made only to those taxpayers who complied with the protest requirements of N.C.G.S. § 105-267 rather than to all taxpayers unconstitutionally taxed pursuant to the statute. To the extent that the decisions of *Bailey v. State of North Carolina*, 330 N.C. 227 (1991), and *Swanson v. State of North Carolina*, 335 N.C. 674 (1994) imply otherwise, they are disavowed.

Justice FRYE concurring in part and dissenting in part.

Justice WEBB concurring in part and dissenting in part.

On discretionary review pursuant to N.C.G.S. § 7A-31 prior to a determination by the Court of Appeals from an order for plaintiffs entered by Thompson, J., on 2 June 1995 and an amended order entered on 25 September 1995 in Superior Court, Wake County. Heard in the Supreme Court 12 September 1996.

*Womble Carlyle Sandridge & Rice, P.L.L.C., by G. Eugene Boyce, for petitioner-appellants and -appellees.*

*Michael F. Easley, Attorney General, by Edwin M. Speas, Jr., Senior Deputy Attorney General, Norma S. Harrell, Special Deputy Attorney General, and Marilyn R. Mudge, Assistant Attorney General, for respondent-appellants and -appellees.*

*Marvin Schiller on behalf of The State Employees Association of North Carolina, Inc., amicus curiae.*

**BAILEY v. STATE OF NORTH CAROLINA**

[348 N.C. 130 (1998)]

LAKE, Justice.

This is an appeal from an order entered essentially in plaintiffs' favor by the Honorable Jack A. Thompson in Superior Court, Wake County, pursuant to assignment and designation of the case as an exceptional case under Rule 2.1 of the General Rules of Practice. Following a two-week trial, including the testimony of twenty-four witnesses and 1,689 pages of transcript, and subsequent proceedings before the trial court, a final order on all issues was entered 25 September 1995.

This class action was initiated by the filing of plaintiffs' complaint on 2 October 1992. Many of the plaintiffs in this suit had previously brought a virtually identical suit, which resulted in certification of the class and partial summary judgment for plaintiffs. This ruling was reversed on appeal by this Court for failure of plaintiffs to comply with mandatory protest or demand requirements contained in N.C.G.S. § 105-267, which the Court held was the exclusive method for challenging unconstitutional or invalid income taxes in North Carolina. *Bailey v. North Carolina*, 330 N.C. 227, 412 S.E.2d 295 (1991), *cert. denied*, 504 U.S. 911, 118 L. Ed. 2d 547 (1992) (*"Bailey I"*). Plaintiffs took a voluntary dismissal in *Bailey I* before filing this action.

Plaintiffs' motion for class certification was again allowed by an order filed 10 October 1994, certifying a class of state and local government retirees and beneficiaries with claims for tax years 1989, 1990 and 1991 who had complied with North Carolina requirements for refund claims.

The trial court's judgment for plaintiffs was contained in two orders, the import of which held that the 1989 legislation which partially taxed state and local government retirement benefits was an unconstitutional impairment of contract under the United States Constitution. The trial court also ruled that the taxation was a material breach of contract, was an unconstitutional retroactive tax, violated judges' state constitutional rights not to have their salaries diminished during office, and violated other state and federal constitutional provisions.

On 25 September 1995, the trial court entered an Amended Order in Wake County Superior Court. The amended order made further findings of fact and conclusions of law and ruled on certain of plaintiffs' claims which were previously unaddressed. The amended order

also provided for retirees who had five or more years of retirement system service as of 12 August 1989 to recover income taxes paid on retirement benefits since 1989 in the form of tax credits or refunds, if they had filed timely "protests." It also enjoined defendants to cease collecting income taxes on state and local government retirement benefits attributable to service prior to 1989. The amended order further provided for fifteen percent of the refund or credit amount for each plaintiff class member to be paid to a common fund for payment of plaintiffs' attorney's fees and various expenses and costs, with any excess remaining in the common fund to be paid to the State Employees' Association. Finally, the amended order stayed, pending appeal, the relief awarded to plaintiffs, including refunds, credits, and injunctive relief, except for notice to class members and preservation of relevant records.

Defendants filed notice of appeal on 25 September 1995. On 5 February 1996, defendants filed with this Court a petition for discretionary review prior to determination by the Court of Appeals. This petition was allowed by this Court on 3 April 1996.

The facts relevant to this appeal as established at trial are as follows. Beginning in 1939, the North Carolina General Assembly established numerous programs for the provision of retirement benefits to North Carolina state and local government employees. As of 12 August 1989, the date on which the General Assembly enacted chapter 792 of the 1989 Session Laws, the legislation which is the subject of this case, at least thirteen different public employee retirement systems were operating for the purpose of providing public servants with retirement benefits. These various systems are set forth in chapters 58, 120, 127A, 128, 135, 143, 143B, 147 and 161 of the North Carolina General Statutes (collectively referred to as the "Retirement Systems"). The Retirement Systems include three different benefit and contribution schemes: mandatory defined benefit plans with mandatory contribution, optional defined contribution plans or defined benefit plans to which employees may contribute, and noncontributory defined benefit plans.

The mandatory defined benefit systems include the Legislative Retirement System (LRS), the Consolidated Judicial Retirement System (CJRS), the Teachers' and State Employees' Retirement System (TSERS), the Local Government Employees' Retirement System (LGERS), and the Disability Income Plan (DIP). During the period relevant to this appeal, all full-time state and local government

employees had to be a member of at least one of these systems and were required to contribute a specified percentage of their salary to the system through payroll deduction. Prior to 12 August 1989, an exemption from state and local taxation was allowed for each of the above systems, providing:

> the right of a person to a pension, an annuity, or a retirement allowance, to the return of contributions, the pension, annuity or retirement allowance itself, any optional benefit or any other right accrued or accruing to any person under the provisions of [the primary deferred benefit retirement acts], and the moneys in the various funds . . . are hereby exempt from any state or municipal tax, and exempt from levy and sale, garnishment, attachment, or any other process whatsoever . . . .

N.C.G.S. § 128-31 (1986) (LGERS); *accord* N.C.G.S. § 120-4.29 (1986) (LRS); N.C.G.S. § 135-9 (1988) (TSERS); N.C.G.S. § 135-111 (1988) (DIP); N.C.G.S. § 135-52(a) (1988) (CJRS).

The optional defined contribution or defined benefit plans include the Supplemental Retirement Income Plan (SRIP), the Deferred Compensation Plan (DCP), and the Supplemental Retirement Income Plan for State Law Enforcement Officers (SRIPLEO). For each of these plans, employees could contribute during the course of their employment but were not required to contribute. An exemption from taxation was allowed for benefits accruing as a result of participation in these plans prior to 12 August 1989 in one of the following forms: "These benefits are . . . exempt from all State and local taxation," N.C.G.S. § 147-9.4 (1987) (DCP), or "[t]he right . . . to the benefits . . . is nonforfeitable and exempt from levy, sale, garnishment, and the benefits payable under this Article are hereby exempt from any State and local government taxes," N.C.G.S. § 143-166.30(g) (1987) (SRIPLEO); *accord* N.C.G.S. § 135-95 (1988) (SRIP).

The noncontributory defined benefit plans include the National Guard Pension Fund (NGPF), the Register of Deeds Supplemental Pension Fund (RofDSPF), the Separate Insurance Benefits Plan (SIBP), and the Sheriffs' Supplemental Pension Fund (SSPF). Employees were neither required to nor allowed to contribute to these systems, but benefits were offered to all employees eligible for participation in the plans. For each of these systems, an exemption from taxation was allowed prior to 12 August 1989 under one of the following provisions: "Benefits paid under the provisions of

this [retirement system] shall be exempt from North Carolina income tax," N.C.G.S. § 143-166.85(e) (1987) (SSPF); *accord* N.C.G.S. § 127A-40(e) (Supp. 1979) (NGPF); N.C.G.S. § 161-50.5 (1987) (RofDSPF); or "The right of a participant . . . to the benefits provided . . . is nonforfeitable . . . and the benefits payable . . . are exempt from any State and local government taxes," N.C.G.S. § 143-166.60(h) (1987) (SIBP).

Each of these systems contains certain preconditions to the receipt of benefits. The primary one is the requirement that employees work a predetermined amount of time in public service before they are eligible for retirement benefits. After employment for the set number of years, an employee is deemed to have "vested" in the retirement system. Thereafter, the employee generally is guaranteed a percentage payment at retirement based upon years of service. Since the inception of the Retirement Systems, the periods of employment required for vesting have been shortened. For example, the LGERS, TSERS and CJRS or their predecessor systems were shortened over time from twenty years' service to the present five years' service. Plaintiff class members each completed five or more years of creditable public service prior to 12 August 1989, retired, and received benefits under one of the Retirement Systems after their retirement.

From their inception and until 12 August 1989, the benefits paid plaintiff retirees from the Retirement Systems were exempted from state taxation. Evidence adduced at trial established that the exemptions were contained in the aforementioned retirement statutes, alongside the requirements for and descriptions of benefits, as opposed to being located among or within the statutes providing the individual income tax provisions or other tax statutes. Numerous employee witnesses testified that defendants' agents offered the exemptions as a type of compensation to employees of state and local governments. The testimony reveals that often the exemption of benefits from taxation was communicated to prospective employees with the intent of inducing individuals to either begin or continue public service employment. Moreover, testimony and exhibits offered at trial establish that innumerable communications were made to plaintiff public employees throughout their careers, both orally and in writing (including multiple unequivocal written statements in official publications and employee handbooks) that their retirement benefits would be exempt from state taxation. Plaintiffs assert they relied on such statutes and communications as assuring compensa-

tion in the form of such exemption in exchange for public service. Upon accepting employment, plaintiffs also bore the risk that they would receive no benefits and that their contributions would be returned without interest should they fail to work the time required for vesting.

The exemption from state taxation on retirement benefits paid by the State, as provided under the Retirement Systems, applied only to state and local government employees and was not available to federal government employees. This case is one of many that arose in the wake of the United States Supreme Court's ruling in *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 103 L. Ed. 2d 891 (1989). In *Davis*, the Supreme Court held that if a state taxes state and local government employees differently than it taxes federal employees, the state violates the constitutional doctrine of intergovernmental tax immunity as well as federal statutory law. *Id.* at 817, 103 L. Ed. 2d at 906. Under 4 U.S.C. § 111, the federal government expressly "consents to the taxation [by states] of pay or compensation for personal service as an officer or employee of the United States . . . if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation." 4 U.S.C. § 111 (1988). Since the State made different provisions for taxation of federal employees (i.e., the exemption from state tax), the exemption was held to be violative as applied. *Davis*, 489 U.S. at 817, 103 L. Ed. 2d at 906.

In response to *Davis*, the North Carolina General Assembly passed 1989 Session Laws chapter 792, section 3.9 ("the Act"). The Act changed the exemption of retired state employees from taxation on retirement benefits in two important ways. First, the Act amended the exemption to provide it to all governmental employees—state, local and federal. Second, the Act placed a $4,000 cap on the amount of annual benefits that would be exempt from state taxation. N.C.G.S. § 105-134.6 (1989) (adjustments to taxable income).

Class plaintiffs are North Carolina state and local government employees whose retirement benefits vested on or before 12 August 1989, the ratification date of the Act. Plaintiffs assert, *inter alia*, that the State's removal of the exemption beyond the amount of $4,000 operated unconstitutionally to deprive them of benefits to which they had a vested right.

In this opinion, we first address whether plaintiffs have a contractual right to an exemption of their benefits from state taxation that has been impaired by the Act. Necessary to a full consideration

of this question is examination of several subissues, including the legal relationship between vested members of the Retirement Systems and the State, the constitutionality of the State's contracting for a tax exemption, the factual basis of plaintiffs' contract claim, and finally the degree and reasonableness of the State's impairment of those contracts. In the second part of this opinion, we examine whether the State's passage of the Act amounts to a taking of plaintiffs' property without just compensation. Next, we consider whether the trial court erred by enjoining the State from future collection of the taxes in question. We then review the trial court's creation of a common fund for payment of fees and expenses incurred by plaintiffs. Lastly, we address whether the trial court erred by limiting recovery only to those plaintiffs who met the statutory requirements for filing a tax refund lawsuit as opposed to all retirees affected by the Act.

## I. IMPAIRMENT OF CONTRACT

The central issue in this case is whether the plaintiffs have an enforceable contract right that has been unconstitutionally impaired by the State of North Carolina. Plaintiffs urge this Court to follow the Court of Appeals' decision in *Simpson v. N.C. Local Gov't Employees' Retirement Sys.*, 88 N.C. App. 218, 363 S.E.2d 90 (1987), *aff'd per curiam*, 323 N.C. 362, 372 S.E.2d 559 (1988), which held that the relationship between the Retirement Systems and state employees who have vested in those systems is contractual in nature. Defendants argue that no contractual relationship exists between the Retirement Systems and the employees in this case. This argument is based on several contentions, notably that: (1) *Simpson* was wrongly decided, and there is no contractual relationship between vested state employees and the Retirement Systems; (2) as a general matter, statutes are statements of policy, and the legislature expressed no intent to create a contract for a tax exemption through the statute; and (3) the North Carolina Constitution prohibits contracting away the State's sovereign "power to tax" under Article V, Section 2(1). Upon analysis, we conclude that plaintiffs did have an enforceable contract right which has been impaired by the State through the passage of the Act by the General Assembly.

Article I, Section 10 of the United States Constitution, the "Contract Clause," provides in pertinent part, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10. In determining whether a contractual right has been unconstitutionally impaired, we are guided by the three-part test set forth in *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 52 L. Ed. 2d

92 (1977). The *U.S. Trust* test requires a court to ascertain: (1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose. *Id.*

### A. *Contractual Obligation*

**[1]** The first step of our analysis is determining whether a contractual obligation is present between plaintiffs and the State. The most pertinent North Carolina case on this subject is the Court of Appeals' decision in *Simpson*. In *Simpson*, plaintiffs were vested members of the North Carolina Local Government Employees' Retirement System. They brought a class-action suit against the State of North Carolina, the retirement system and its board of trustees. Plaintiffs argued that the State unconstitutionally impaired their contractual rights to a specific pension plan when the legislature amended the method of calculating the plan's benefits, resulting in a reduction of their benefits. The Court of Appeals, upon examination of approaches taken by other states, agreed and held that "the relationship between plaintiffs and the Retirement System is one of contract." *Simpson*, 88 N.C. App. at 223, 363 S.E.2d at 93. This was based on the premise that retirement benefits are presently earned but deferred compensation to which employees have a vested contractual right. *Id.* at 223, 363 S.E.2d at 93-94. As the Court of Appeals stated:

> "A pension paid a governmental employee . . . is a deferred portion of the compensation earned for services rendered." If a pension is but deferred compensation, already in effect earned, merely transubstantiated over time into a retirement allowance, then an employee has contractual rights to it. The agreement to defer the compensation is the contract. Fundamental fairness also dictates this result. A public employee has a right to expect that the retirement rights bargained for in exchange for his loyalty and continued services, and continually promised him over many years, will not be removed or diminished. Plaintiffs, as members of the North Carolina Local Governmental Employees' Retirement System, had a *contractual right to rely on the terms of the retirement plan as these terms existed at the moment their retirement rights became vested.*

*Id.* at 223-24, 363 S.E.2d at 94 (quoting *Great Am. Ins. Co. v. Johnson*, 257 N.C. 367, 370, 126 S.E.2d 92, 94 (1962)) (emphasis added).

The Court of Appeals and this Court have reaffirmed this central principle of *Simpson* in several subsequent cases. *Faulkenbury v. Teachers' & State Employees' Retirement Sys.*, 345 N.C. 683, 483 S.E.2d 422 (1997) (vested plaintiffs had contractual right to disability retirement benefits, making subsequent amendment of calculation method subject to impairment analysis); *Miracle v. N.C. Local Gov't Employees Retirement Sys.*, 124 N.C. App. 285, 477 S.E.2d 204 (1996) (pension terms at time of plaintiff's vesting deemed contractual, and subsequent alteration by the legislature subject to impairment analysis under Article I, Section 10 of the United States Constitution), *disc. rev. denied*, 345 N.C. 754, 485 S.E.2d 57 (1997); *Hogan v. City of Winston-Salem*, 121 N.C. App. 414, 466 S.E.2d 303 (pension term allowing retirement instead of transfer upon injury deemed contractual, and alteration after plaintiff's injury deemed subject to impairment analysis), *aff'd per curiam*, 344 N.C. 728, 477 S.E.2d 150 (1996); *Woodard v. N.C. Local Gov't Employees' Retirement Sys.*, 108 N.C. App. 378, 424 S.E.2d 431 (amendment of disability benefits impaired vested member's contract), *aff'd per curiam*, 335 N.C. 161, 435 S.E.2d 770 (1993).

An examination of North Carolina case law, as well as an analysis of the principles underlying *Simpson*, confirms that the contractual relationship approach taken by the Court of Appeals in *Simpson* and our subsequent decisions is the proper one. Thus, it follows that the retirement benefits of all employees whose retirement rights became vested prior to 12 August 1989 must be exempt from state tax without regard to whether those benefits are attributable to service prior to or after that date.

Cases arising in North Carolina have long demonstrated a respect for the sanctity of private and public obligations from subsequent legislative infringement. *See, e.g., Trustees of the Univ. of N.C. v. Foy*, 5 N.C. 58 (1805); *see also Springs v. Scott*, 132 N.C. 548, 44 S.E. 116 (1903) (judgment is a vested property right that cannot be taken by the legislature); *Dunham v. Anders*, 128 N.C. 207, 38 S.E. 832 (1901) (legislature has no power to destroy or to interfere with vested rights). In fact, scholars credit this Court, in the case of *Trustees v. Foy*, with being the first state or federal court to interpret the phrase "due process" as a protection of private rights against the lawmaking power of the legislature. Robert F. Utter, *Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds*, 63 Tex. L. Rev. 1025, 1031-32, 1031 n.28 (1985). This Court in *Foy*

BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

interpreted the "Law of the Land" Clause, currently found in Article I, Section 19 of our Constitution, to mean that "individuals shall not be so deprived of their liberties or properties, unless by a trial by jury in a court of justice, according to the known and established rules of decision derived from the common law and such acts of the Legislature as are consistent with the Constitution." *Foy*, 5 N.C. at 88.

This respect for individual rights has manifested itself through the expansion of situations in which courts have held contractual relationships to exist, and in which they have held these contracts to have been impaired by subsequent state legislation. In *Jones v. Crittenden*, 4 N.C. 55 (1814), this Court afforded protection to a private debtor-creditor contract by striking down an act of the legislature that temporarily suspended executions of judgments against debtors. In *Stanmire v. Taylor*, 48 N.C. 207 (1855), this Court extended contractual protection to a grant of property by the State by declaring unconstitutional a legislative act that sought to grant land previously granted by the State to someone else. This Court held that the first grant gave to the recipient a contractually based vested right that could not be impaired by subsequent legislation. *Id.* at 213; *see also Ogelsby v. Adams*, 268 N.C. 272, 150 S.E.2d 383 (1966) (statutory attempt to raise fee during term of lease of state property found to impair lease contract). In the case of *Wilmington & Weldon R.R. Co. v. Reid*, 80 U.S. 264, 20 L. Ed. 568 (1871), the United States Supreme Court applied the contractual analysis to a North Carolina incorporation charter and determined that the charter, which contained an exemption from all taxes for the company, created a contract between the railroad and the State. *Id.* at 267-68, 20 L. Ed. at 569. A subsequent legislative attempt to tax the property of the railroad was, therefore, an unconstitutional impairment of the contract. *Id.* at 268, 20 L. Ed. at 570. In *Broadfoot v. City of Fayetteville*, 124 N.C. 478, 32 S.E. 804 (1899), this Court extended that contractual analysis to municipal bond obligations. In that case, the Court held that the General Assembly's establishment of a new city charter that prohibited Fayetteville from taxing its citizens to pay for plaintiff's bonds issued under the old charter was an unconstitutional impairment of contract. *Id.* at 489-90, 32 S.E. at 807; *see also Bryson City Bank v. Town of Bryson City*, 213 N.C. 165, 195 S.E. 398 (1938) (ordinance limiting taxation subsequent to issuance of bonds constituted impairment of contract to the extent the town was thereby unable to meet its obligation). In *First Nat'l Bank of Charlotte v. Jenkins*, 64 N.C. 719 (1870), this Court extended protection from impairment beyond

the strict contractual terms and beyond application to just the offeror and offeree by holding that equities arising in favor of a creditor out of contract between the State and the debtor are afforded protection. *Id.* at 725. A more recent and far-reaching case in this area is *Pritchard v. Elizabeth City,* 81 N.C. App. 543, 344 S.E.2d 821, *disc. rev. denied,* 318 N.C. 417, 349 S.E.2d 598 (1986). There, the Court of Appeals held that oral representations to municipal employees by city officials regarding accrual of benefits, upon which the employees relied, constituted a contractual agreement to which the city was bound. *Id.* at 551-53, 344 S.E.2d at 826-27. The court found no impairment, however, because the act that purportedly affected the benefits had not been applied retroactively.

The basis of the contractual relationship determinations in these and related cases is the principle that where a party in entering an obligation relies on the State, he or she obtains vested rights that cannot be diminished by subsequent state action. In *Jones v. Crittenden,* this Court stated, "The first principles of justice teach us that he to whom a promise is made under legal sanctions should signify his consent *before* any part of it can be rightfullly canceled by a legislative act." *Jones,* 4 N.C. at 57 (emphasis added). In *Stanmire,* this Court quoted Chief Justice John Marshall in underscoring the inviolate nature of vested contractual rights:

"A law," says Judge Marshall, "annulling conveyances between individuals, and declaring that the grantors should stand seized of their former estates, notwithstanding those grants, would be as repugnant to the [c]onstitution[] as a law discharging the vendors of property[] from the obligation of executing their contracts by conveyances." Neither can the Legislature discharge itself from its obligation to perform its contracts.

*Stanmire,* 48 N.C. at 213 (quoting *Fletcher v. Peck,* 10 U.S. 87, 137, 3 L. Ed. 162, 178 (1810)). In *Broadfoot,* this Court upheld vested contractual rights even against the State's power to control taxation on the basis that "the power of taxation which is vested in the Legislature . . . is subject to the qualification which attends all State legislation—that is, that it must not be exercised to impair the obligation of contracts, thereby conflicting with the Constitution of the United States and of North Carolina." *Broadfoot,* 124 N.C. at 489, 32 S.E. at 807. In *Ogelsby,* this Court again enunciated the underlying expectational interests safeguarded by the Contract Clause protection of vested rights:

**BAILEY v. STATE OF NORTH CAROLINA**

[348 N.C. 130 (1998)]

"The general principle is established in American jurisprudence that a legislative grant under which rights have vested amounts to a contract . . . ." "*[A] legislative enactment in the ordinary form of a statute may contain provisions which, when accepted as the basis of action by individuals or corporations, become contracts between them and the State* within the protection of the clause of the Federal Constitution forbidding impairment of contract obligations; *rights may accrue under a statute or even be conferred by it, of such character as to be regarded as contractual,* and such rights cannot be defeated by subsequent legislation. When such a right has arisen, the repeal of the statute does not affect the right or an action for its enforcement."

*Ogelsby,* 268 N.C. at 273-74, 150 S.E.2d at 385 (quoting 16 Am. Jur. 2d 790 *Constitutional Law* § 442 (1966)) (emphasis added).

Earlier North Carolina decisions involving the governmental provision of pensions, as well as *Simpson,* are similarly rooted in the protection of expectational interests upon which individuals have relied through their actions, thus gaining a vested right. In the case of *In re Smith,* 130 N.C. 638, 41 S.E. 802 (1902), this Court addressed the issue of whether pension warrants erroneously issued to pensioners after their death were property of the pensioners' estates. In concluding that they were not, the Court reasoned that pension warrants are charitable gifts because they are granted by the State only on the basis of indigence as defined in the statute. *Id.* at 639, 41 S.E. at 802. The Court went on to say, however, that had the pension warrants been disbursed as reimbursement or compensation, then they would belong to the estates. *Id.* The Court also recognized that had the pension warrants been issued before death but not cashed until after death, then the pensioners' estates would also be entitled to the benefits. *Id.* at 639, 41 S.E. at 803. These determinations imply that pensioners have vested rights to pension payments that are earned and have become due. *See* R.D. Hursh, *Vested Right of Pensioner to Pension,* 52 A.L.R. 2d 437, at 470-71 (1957). In *Dillon v. Wentz,* 227 N.C. 117, 41 S.E.2d 202 (1947), this Court addressed the question of how assets of a public employees' pension fund should be distributed upon dissolution of the fund. The Court determined that the members whose claims have accrued at the time of the dissolution have a "vested interest" in their benefits; and therefore, those members' benefits should be paid in full before distribution of the remainder of the fund. *Id.* at 122, 41 S.E.2d at 207.

In *Simpson*, the same principles were applied. There, the Court of Appeals concluded not only that employees relied on the representations regarding their pension benefits as consideration for their continued employment, but also that the pension benefits were "deferred compensation, already in effect earned." *Simpson*, 88 N.C. App. at 223, 363 S.E.2d at 94. Thus, the employees "had a contractual right to rely on the terms of the retirement plan as these terms existed at the moment their retirement rights became vested." *Id.* at 224, 363 S.E.2d at 94. Because the holding in *Simpson* is based on the protection of vested rights, as were the other cases in which courts found a contractual relationship, the *Simpson* court's determination that the relationship between employees vested in the retirement system and the State is contractual in nature is the appropriate conclusion.

However, this determination does not end our analysis. This Court must determine whether the tax exemption was a condition or term included in the retirement contract. Our role in reviewing this issue is limited. Where the trial is conducted by the judge sitting without a jury, as occurred in this case, the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding. *Curl v. Key*, 311 N.C. 259, 260, 316 S.E.2d 272, 273 (1984). In the present case, the trial court found as a fact that "[a] reasonable person would have concluded from the totality of the circumstances and communications made to plaintiff class members that the tax exemption was a term of the retirement benefits offered in exchange for public service to state and local governments." A thorough review of the record reveals abundant, competent evidence to support this finding, including *inter alia*: creation of various statutory tax exemptions by the legislature, the location of those provisions alongside the other statutorily created benefit terms instead of within the general income tax code, the frequency of governmental contract making, communication of the exemption by governmental agents in both written and oral form, use of the exemption as inducement for employment, mandatory participation, reduction of periodic wages by contribution amount (evidencing compensation), loss of interest for those not vesting, establishment of a set time period for vesting, and the reliance of employees upon retirement compensation in exchange for their services. Thus, it is clear the tax exemption was a term or condition of benefits of the Retirement Systems to which plaintiffs have a contractual right.

BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

Defendants cite *Bowers v. City of High Point*, 339 N.C. 413, 451 S.E.2d 284 (1994), in support of their argument that government officials acted *ultra vires* in communicating to prospective and employed workers that the tax exemption was a contractual part of retirement benefits. However, *Bowers* is distinguishable from the present case. In *Bowers*, a municipal official calculated compensation in a manner not authorized by any state statute, thus exceeding the municipality's power and making the official's act *ultra vires*. *Id.* at 418-19, 451 S.E.2d at 288-89. In the case *sub judice*, the legislature created a statutorily valid exemption, and therefore, state officials acted within their power.

**[2]** Defendants next argue that even if the tax exemption was a condition of the retirement contracts, the creation of that condition was unconstitutional. This assertion is based on their reading of Article V, Section 2(1) of the North Carolina Constitution, which provides that "[t]he power of taxation . . . shall never be surrendered, suspended, or contracted away." N.C. Const. art. V, § 2(1). Defendants contend that the exemption constitutes an unconstitutional contracting away of the power of taxation because it permanently deprives the State of its sovereign right to tax retirees. We find this argument unpersuasive.

As an initial matter, " '[t]he rule is well settled that one who voluntarily proceeds under a statute and claims benefits thereby conferred will not be heard to question its constitutionality in order to avoid its burdens.' " *Convent of Sisters of St. Joseph v. City of Winston-Salem*, 243 N.C. 316, 324, 90 S.E.2d 879, 885 (1956) (quoting 11 Am. Jur. *Constitutional Law* § 123, at 767 (1937)). In this case, the State created the exemption and then proceeded for decades to represent it as a portion of retirement benefits and to reap its contractual benefits. It is clear from the record evidence that the State used these representations as inducement to employment with the State, and employees relied on these representations in consideration of many years' valuable service to and with the State. The State's attempt to find shelter under the North Carolina Constitution must be compelling indeed after such a long history of accepting the benefits of the extension of the exemption in question. We find no such compelling case here.

Upon examination of the circumstances surrounding this case and the Act at issue, we must conclude that the State has failed to establish that the tax exemption is an unconstitutional contracting

away of the power to tax. A thorough reading of Article V, Section 2 of the state Constitution reveals that the State is empowered to enter into contracts for tax exemptions. As well as ensuring that the power of taxation may never be contracted away, Article V, Section 2 also contains other provisions regarding taxing and contracting by the State. Subsection (6) provides that, regarding income taxes, "there shall be allowed . . . exemptions." N.C. Const. art. V, § 2(6). Subsection (3) further provides that "[n]o taxing authority *other* than the General Assembly may grant exemptions, and the General Assembly shall not delegate the powers accorded to it." N.C. Const. art. V, § 2(3) (emphasis added). Section 2 also establishes that the "State . . . may contract with . . . any person . . . for the accomplishment of public purposes only." N.C. Const. art. V, § 2(7). We cannot read subsection (1) in isolation as the State would have us do. Isolated interpretations of statutory and constitutional provisions are contrary to the jurisprudence of North Carolina. *See, e.g., State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944). In light of the interplay between subsections (3), (6) and (1), it is apparent that the granting of an exemption is not the same thing as relinquishing the "power" of taxation. If it were, no exemptions would be possible—a result incongruous with express provisions of the Constitution. Combining these subsections with the power to make contracts granted in subsection (7), it is clear that the State may make contracts for exemptions without contracting away the "power" of taxation as long as the contract is for a public purpose. However, once such a contract is made, the Supremacy Clause of the United States Constitution comes into effect in order to prevent subsequent impairment of that contract.

The sovereign power of taxation is not, as defendants appear to assert, an inviolable power, the exercise of which the State may never limit by obligation. In *U.S. Trust*, the Supreme Court draws a distinction between cases involving "reserved powers" that cannot be contracted away in any manner, such as the police power and eminent domain, and those powers for which a state can bind itself to a limitation for the future, such as taxing and spending. *U.S. Trust*, 431 U.S. at 23-25, 52 L. Ed. 2d at 110-11. The fact that the contract between the State and its retirees limits the ability of the State to tax under certain circumstances, in this instance the benefits of those in whom the benefits have vested, does not inherently undermine the State's sovereign power of taxation. "The constitutional provision against impairing contract obligations is a *limitation* upon the taxing power,

as well as upon all legislation, whatever form it may assume. Indeed, attempted state taxation is the mode most frequently adopted to affect contracts contrary to the constitutional inhibition." *Murray v. City Council of Charleston*, 96 U.S. 432, 444, 24 L. Ed. 760, 762-763 (1877) (emphasis added). Such a specific limitation as provided here by conditional exemption, that is, the limitation of a tax levied (i.e., income tax), does not equate to a limitation of the general power to levy.

The necessity for the State to be bound to its contractual obligations is clear when the Act in question is compared with the long-established practice of the issuance of municipal bonds. The State regularly enters into contracts for tax exemptions in connection with its issuance of municipal bonds and the creation of its obligations thereunder. In exchange for paying a lower rate of interest, the State agrees by statutory exemption to forgo taxation of the income or gain on the bonds. The State's policy of entering into a contract for a tax exemption clearly serves a public purpose by inducing needed investment for important projects while paying a lower-than-market rate of interest.

The State's action here in changing the taxability of vested retirement benefits is no different than if the State issued tax-free bonds, collected hundreds of millions of dollars for their purchase, and then retrospectively repealed investors' tax-free interest and capital gain advantages. However, under application of defendants' premise, this is precisely what the State could do. The basis for prohibiting such action is fundamental fairness. As the Pennsylvania Supreme Court so eloquently stated:

> According to the cardinal principle of justice and fair dealings between government and man, as well as between man and man, the parties shall know prior to entering into a business relationship the conditions which shall govern that relationship. *Ex post facto* legislation is abhorred in criminal law because it stigmatizes with criminality an act entirely innocent when committed. The impairment of contractual obligations by the Legislature is equally abhorrent because such impairment changes the blueprint of a bridge construction when the spans are half way across the stream.

*Hickey v. Pension Bd.*, 378 Pa. 300, 309-10, 106 A.2d 233, 237-38 (1954).

Here, in exchange for the inducement to and retention in employment, the State agreed to exempt from state taxation benefits derived from employees' retirement plans. This exemption certainly was for a public purpose, as it was a significant difference between governmental and comparable private employment that helped attract and keep quality public servants in spite of the generally lower wage paid to state and local employees. Thus, the State entered into a contract for, *inter alia*, a tax exemption for a public purpose. As the Oregon Supreme Court explained in a case similar to the one *sub judice*:

> Government obtained its employees' services less expensively because the gross cost of providing a more nearly adequate pension amount was lowered by the tax exempt nature of the benefit payments and of the contributions put in trust to purchase annuities payable at the time of each employee's future retirement. . . . Less expense meant that less tax money was exacted from the taxpayers in general over past years to fund a public employee's salary and benefits.

*Hughes v. Oregon*, 314 Or. 1, 43 n.7, 838 P.2d 1018, 1042 n.7 (1992). Once the commitment is made, and its derivative benefits enjoyed by the State, the State can no more remove this condition than it can tax the interest and gain of municipal bond holders. "Government proposes to keep the benefit of lower cost, but to take away the promise that its employees accepted in order to lower that cost, thereby keeping the benefit of its bargain but depriving the employees of the benefit of theirs." *Id.* Such a "change in the blueprint" is not acceptable in a government guided by notions of fairness, consent and mutual respect between government and man, and certainly not between the government of this State and its employees.

We therefore hold that the relationship between the Retirement Systems and employees vested in the system is contractual in nature, the right to benefits exempt from state taxation is a term of such contract, and such exemption does not constitute an unconstitutional contracting away of the State's sovereign power of taxation. Thus, plaintiffs have met their obligation under the first part of the *U.S. Trust* test.

### B. Impairment

[3] Having found a contractual relationship and the existence of a valid exemption in the contract, we now turn our focus to the second

prong of the *U.S. Trust* test, whether the contract was impaired by the Act in question. *U.S. Trust*, 431 U.S. at 17, 52 L. Ed. 2d at 106. When examining whether a contract has been unconstitutionally impaired, the "inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. . . . Minimal alteration of contractual obligations may end the inquiry at [this] stage." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244-45, 57 L. Ed. 2d 727, 736-37 (1978). Defendants contend that the tax exemption provision is only incidental to the basic contract for retirement benefits. We disagree.

The legislative amendment placed a $4,000 annual exemption cap on retirement benefits. While this will affect retirees in differing degrees depending on their individual benefit levels, the overall impact is substantial. The record evidence reveals that, at last count, losses to retirees in expected income will be in excess of $100 million. In *Simpson*, the Court of Appeals determined that plaintiffs' contractual rights had been impaired, "as plaintiffs stand to suffer significant reductions in their retirement allowances as a result of the legislative amendment under challenge." *Simpson*, 88 N.C. App. at 225, 363 S.E.2d at 94. Such is the case here. Thus, it is clear and we hold that the statutory amendment in question substantially impairs the employees' contractual right to a tax exemption.

## C. *Reasonableness and Necessity of Impairment*

[4] Having decided the first two questions in the affirmative, we lastly consider the third prong of the *U.S. Trust* test, whether the impairment was reasonable and necessary to serve an important public purpose. *U.S. Trust*, 431 U.S. at 25-26, 52 L. Ed. 2d at 111-12. Not every impairment of contractual obligations by a state violates the Contract Clause. *Id.* at 21, 52 L. Ed. 2d at 109. Through the exercise of its police power, a state may constitutionally impair its contractual obligations to protect the general welfare of its citizens, so long as such impairment is reasonable and necessary to serve an important public purpose. *Id.* at 25-26, 52 L. Ed. 2d at 111-12; *Simpson*, 88 N.C. App. at 224, 363 S.E.2d at 94. In applying this test, the courts are not bound by just any rationale put forward by the legislature to justify its actions. The Supreme Court noted in *U.S. Trust* that:

> In applying this standard, . . . complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do

not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*U.S. Trust*, 431 U.S. at 25-26, 52 L. Ed. 2d at 112. Defendants assert that the exemption cap was a reasonable and necessary approach to effectuating the important state interest of complying with the Supreme Court's *Davis* decision. We find defendants' argument here unpersuasive.

While it is clear that the state interest in this case—complying with a Supreme Court ruling—was important, what is equally clear is that the method chosen was not necessary to achieve the state interest asserted. In *Davis*, the Supreme Court did not tell North Carolina that it was required to tax state and local employees; nor did it set forth any mandatory scheme of compliance. *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 103 L. Ed. 2d 891. The Court merely held that federal retirees had to be treated the same as state and local retirees. *Id.* There are numerous ways that the State could have achieved this goal without impairing the contractual obligations of plaintiffs. Two of the most obvious ways would have been either to exempt federal employees or to apply the exemption cap prospectively only to those state and local employees whose retirement benefits had not yet vested. Thus, we hold the Act which placed a cap on tax-exempt benefits was not necessary to a legitimate state or public purpose, i.e., it was not "essential" because "a less drastic modification" of the State's exemption plan was available. *U.S. Trust*, 431 U.S. at 30, 52 L. Ed. 2d at 114. As the Supreme Court stated, "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Id.* at 31, 52 L. Ed. 2d at 115.

Furthermore, the method chosen was not reasonable under the circumstances. The legislature sought a "revenue neutral" approach to complying with the *Davis* decision, meaning that legislators would be faced with neither raising taxes nor cutting other programs in order to comply. However, this convenient approach impaired vested rights of current and future state and local retirees to whom the State had made promises of exemption in consideration of their many years of public service. Legislative convenience is not synonymous with reasonableness. Because the impairment of contracts caused by the Act was neither reasonable nor necessary for achieving an important

state interest, this legislative enactment was not an exercise of the police power or other means under which the State may legitimately skirt the mandate of the Contracts Clause.

### D. Conclusion

For the above-stated reasons, we hold that the plaintiffs have met their burden under the *U.S. Trust* test of establishing an unconstitutional impairment of contract. The plaintiffs had a contractual relationship with the Retirement Systems, and that contract included the tax exemption of benefits derived from their retirement plans. The Act, which placed a cap on the amount of benefits exempted from state taxation, substantially impaired the contract. Finally, the Act was neither necessary nor reasonable for achieving an important state interest. As a result, the Act is unconstitutional as an impermissible impairment of contract under the Contract Clause, Article I, Section 10 of the United States Constitution, with regard to employees whose benefits had vested when it was passed.

## II. TAKING WITHOUT JUST COMPENSATION

[5] Defendants assign error to the trial court's conclusion that the Act's removal of plaintiffs' exemption from taxation on their retirement benefits constitutes a taking of property without just compensation under the "Law of the Land" Clause, Article I, Section 19 of the North Carolina Constitution, and the Fifth and Fourteenth Amendments to the United States Constitution. The trial court concluded as a matter of law that "[r]epeal of the tax exemption was a taking under the federal and state constitution." Defendants argue the Act cannot be considered a taking of property because, under the Supreme Court's decision in *City of Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 41 L. Ed. 2d 132 (1974), the Act constitutes a legitimate exercise of the State's taxing power. Defendants additionally assert that because the exemption cannot be considered contractual, it cannot be considered property deserving of just compensation. We find defendants' arguments to be without merit.

As established above, the relationship between the State and the plaintiffs is contractual in nature, and the plaintiffs' exemption from taxation of benefits from their retirement plans is a term of that contract to which plaintiffs have a vested right. The issue thus becomes whether the subsequent taxation of those benefits via the Act constitutes an unconstitutional taking of property without just compensation under the state and federal Constitutions. Article I, Section 19 of

the North Carolina Constitution reads in pertinent part: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. The Fifth Amendment to the United States Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

This Court recognized in *Morris v. Holshouser*, 220 N.C. 293, 17 S.E.2d 115 (1941), that "[t]he privilege of contracting is both a liberty and a property right. . . . 'Included in the right of personal liberty and the right of private property—partaking of the nature of each—is the right to make contracts for the acquisition of property.'" *Id.* at 295-96, 17 S.E.2d at 117 (quoting *Coppage v. Kansas*, 236 U.S. 1, 14, 59 L. Ed. 441, 446 (1915)). In *Lynch v. United States*, 292 U.S. 571, 78 L. Ed. 1434 (1934), Justice Brandeis, writing for a unanimous Supreme Court, recognized that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States." *Id.* at 579, 78 L. Ed. at 1440. The Court went on to note that impairment of a contract could constitute an impermissible taking by stating, "Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Id.* Such is the case with rights arising out of contracts between the State and individuals through application of the Fourteenth Amendment. *See Department of Transp. v. Harkey*, 308 N.C. 148, 151 n.*, 301 S.E.2d 64, 67 n.* (1983).

Moreover, such contracts are protected by provisions in the state Constitution. *Id.* In *Foy*, this Court was the first in the nation to recognize that the purpose of a written constitution is to place limits on the power of the legislature. This Court premised its analysis of the act considered in *Foy* on the principle "that the people of North Carolina, when assembled in convention, were desirous of having some rights secured to them beyond the control of the Legislature, and these they have expressed in the Bill of Rights and the Constitution." *Foy*, 5 N.C. at 83. The *Foy* Court then recognized "that if the Legislature had *vested* an individual with the property in question, this section of the Bill of Rights [the Law of the Land Clause] would restrain them from depriving him of such right." *Id.* at 87. In *Long v. City of Charlotte*, 306 N.C. 187, 293 S.E.2d 101 (1982), this Court further explained the application of the state Constitution to takings of private property by governmental action:

### BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

Every state constitution, except North Carolina's, contains similar provisions prohibiting the taking of private property for public use without just compensation. While North Carolina does not have an express constitutional provision against the "taking" or "damaging" of private property for public use without payment of just compensation, this Court has allowed recovery for a taking on constitutional as well as common law principles. *We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State*, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. *This principle is considered in North Carolina as an integral part of "the law of the land" within the meaning of Article I, Section 19 of our State Constitution.*

*Id.* at 195-96, 293 S.E.2d at 107-08 (citations omitted) (footnote omitted) (emphasis added). The Court went on to explain that "[g]overnmental immunity is not a defense . . . . 'The test of liability is whether, notwithstanding its acts are governmental in nature and for a lawful purpose, the municipality's acts amount to a partial taking of private property. If so, just compensation must be paid.' " *Id.* at 203, 293 S.E.2d at 111 (quoting *Guilford Realty & Ins. Co. v. Blythe Bros. Co.*, 260 N.C. 69, 79, 131 S.E.2d 900, 907 (1963)).

In the present case, it is clear that the State has taken plaintiffs' private property by passage of the Act. Plaintiffs contracted, as consideration for their employment, that their retirement benefits once vested would be exempt from state taxation. The Act now undertakes to place a cap on the amount available for the exemption, thereby subjecting substantial portions of the retirement benefits to taxation. This is in derogation of plaintiffs' rights established through the retirement benefits contracts and thus constitutes a taking of their private property. The State fails to compensate them for such taking through the Act. As such, the Act is unconstitutional under the state and federal Constitutions.

Defendants' attempt to analogize this case to the Supreme Court's decision in *City of Pittsburgh* is misplaced. There, the Supreme Court held that a city ordinance imposing an unusually high tax on parking in the city did not constitute a violation of due process so as to constitute an unconstitutional taking of the property of parking lot owners. *City of Pittsburgh*, 417 U.S. at 375, 41 L. Ed. 2d at 136.

The Court held that it would not judge the reasonableness of a tax that was *otherwise within the power of the legislative body to enact*, so long as it was not so arbitrary as to constitute a ruse for some forbidden action by the legislative body. *Id.* The instant case is distinguishable in that the Act is not otherwise within the power of the legislature to enact because it violates the constitutional prohibitions against impairing contracts and taking property without just compensation. Thus, the Act cannot be construed as a legitimate exercise of the State's taxing power.

## III. DECLARATORY AND INJUNCTIVE RELIEF

**[6]** Defendants next assign error to the trial court's order for declaratory and injunctive relief in favor of plaintiffs. In its 2 June 1995 order, the trial court held that the Act constituted a material breach of contract and was unconstitutional under numerous provisions of both the state and federal Constitutions. The court went on to conclude that the Act was "void, a nullity and unenforceable." The trial court further concluded in its 25 September 1995 amended order:

> Injunctive relief would be statutorily unavailable to plaintiffs without a final ruling that the portion of the August 12, 1989 Act which repealed the tax exemption on retirement benefits is unconstitutional. And ordinarily sovereign immunity and G.S. 105-267 preclude any relief to plaintiffs in this action other than refunds of additional state income taxes, paid because of the repeal of the tax exemption, for the years 1989, 1990 and/or 1991 for those plaintiffs, including class members, who made appropriate timely refund demands for those tax years. However, it is a useless act for plaintiff class members and other state or local government retirees who had completed five years of creditable service on or before August 12, 1989 to continue to pay taxes on retirement benefits, file protests pursuant to G.S. 105-267, and continue to file lawsuits resulting in multiple duplicative litigation. *Sovereign immunity has been waived by the passage of G.S. 105-267 permitting suits against the State for tax refunds. As the statutory remedies are inadequate, equitable relief including injunction of future collection of taxes on retirement benefits attributable to service rendered or contributions made prior to August 12, 1989 is proper.*

(Emphasis added.) Based on these conclusions, *inter alia*, the trial court then enjoined defendants from further collecting the disputed tax, ordering that defendants "shall cease collecting income taxes

**BAILEY v. STATE OF NORTH CAROLINA**

[348 N.C. 130 (1998)]

calculated upon state and local government retirement benefits paid to all state and local government retirees, for those portions of said retirement benefits attributable to service rendered or contributions made prior to August 12, 1989." However, this injunctive relief was stayed pending appeal.

Defendants assert that, despite the stay, the granting of declaratory and injunctive relief by the trial court was improper. Defendants further contend that the trial court erred and must be reversed in its conclusions of law that sovereign immunity was waived by passage of N.C.G.S. § 105-267 and that injunctive relief is proper since the statutory remedies are inadequate. According to defendants, relief should be limited strictly to refunds of unconstitutionally collected taxes. We generally agree with defendants' contentions but note that the trial court's holding has little if any practical impact on the outcome of this case.

N.C.G.S. § 105-267 contains the procedure required for contesting the taxation under the Act:

No court of this State shall entertain a suit of any kind brought for the purpose of preventing the collection of any tax imposed in this Subchapter. Whenever a person shall have a valid defense to the enforcement of the collection of a tax assessed or charged against him or his property, such person shall pay such tax to the proper officer, and such payment shall be without prejudice to any defense of rights he may have in the premises. At any time within 30 days after payment, the taxpayer may demand a refund of the tax paid in writing from the Secretary of Revenue and if the same shall not be refunded within 90 days thereafter, may sue the Secretary of Revenue in the courts of the State for the amount so demanded. Such suit may be brought in the Superior Court of Wake County, or in the county in which the taxpayer resides at any time within three years after the expiration of the 90-day period allowed for making the refund. If upon the trial it shall be determined that such a tax or any part thereof was levied or assessed for an illegal or unauthorized purpose, or was for any reason invalid or excessive, judgment shall be rendered therefor, with interest, and the same shall be collected as in other cases. The amount of taxes for which judgment shall be rendered in such action shall be refunded by the State; provided, nothing in this section shall be construed to conflict with or supersede the provisions of G.S. 105-241.2.

**BAILEY v. STATE OF NORTH CAROLINA**

[348 N.C. 130 (1998)]

N.C.G.S. § 105-267 (1989) (amended 1996). In *Bailey I*, we held:

> Section 105-267 . . . bars courts absolutely from entertaining suits of any kind brought for the purpose of preventing the collection of any tax imposed in Subchapter I. Since the taxes challenged by plaintiffs were Subchapter I taxes, we hold that the trial court erred in enjoining defendants from further collection of taxes paid on plaintiffs' retirement benefits. Under section 105-267 plaintiffs' remedies are restricted to a refund of any illegal, invalid, or unauthorized tax . . . .

*Bailey I*, 330 N.C. at 242, 412 S.E.2d at 304. This Court further noted that N.C.G.S. § 105-267 was the exclusive basis for challenging taxation under this subchapter, even on constitutional grounds. *Id.* at 235, 412 S.E.2d at 300.

N.C.G.S. § 105-267 is the relevant statute for challenging the Act in the instant case. The only relief granted under this statute is a refund of improperly collected taxes. Nowhere does the statute allow a trial court to grant an injunction from collection of a tax during the pendency of a challenge to taxation under this subchapter. Further, this Court has ruled that the statutory procedures contained in section 105-267 are adequately protective of individuals' due process rights and are the exclusive means by which a tax under this subchapter may be challenged. *Swanson v. North Carolina*, 335 N.C. 674, 687, 441 S.E.2d 537, 545, *cert. denied*, 513 U.S. 1056, 130 L. Ed. 2d 598 (1994). As a result, the trial court technically erred in its conclusion that sovereign immunity had been completely waived by the passage of N.C.G.S. § 105-267 and in its order enjoining defendants from further collection of the tax during the resolution of this case.

However, an examination of the circumstances of this case reveals that the practical effect of the trial court's error was inconsequential. First, the trial court immediately stayed the injunction pending appeal, preventing any undue prejudice to defendants. Second, the trial court determined that plaintiffs would still be required to file refund suits, presumably in accordance with section 105-267, for years not covered by the present litigation, thereby allowing collection of the tax by defendants during the future pendency of the case. Finally, we have by our present decision ruled that the Act is unconstitutional under both the state and federal Constitutions as applied to those employees whose benefits vested prior to its passage. The State, pursuant to this decision, will be prevented from further

attempts to collect taxes on retirement benefits. As such, no ruling in the form of an injunction is necessary to forestall future harm to plaintiffs, thus making the issue of the injunction moot as a practical matter.

Thus, we reaffirm that trial courts may not generally grant injunctions barring future collection of taxes or fashion other remedies not provided in section 105-267. However, we hold that such error here was not prejudicial and that in light of our other determinations in this case, defendants should immediately cease collection of taxes pursuant to the Act on the employees affected by this decision and begin issuance of refunds consistent with the trial court's 25 September 1995 amended order and this opinion. This assignment of error is overruled.

## IV. COMMON-FUND DOCTRINE

[7] Defendants next assign error to the trial court's creation of a "common fund" for the payment of attorney's fees and other costs incurred by the class representatives. In its 25 September 1995 amended order, the trial court ordered defendants to identify all individuals in the plaintiff class who had complied with the statutory requirements for receiving a refund. Next, the trial court established a formula by which the amount of each individual refund would be calculated, including interest. The result of this formulation is the "taxpayer credit amount," or the amount of money due to each plaintiff. The trial court then ordered eighty-five percent of the taxpayer credit amount to be applied against future state income tax liability incurred by plaintiffs or, in the case of plaintiffs who are deceased, no longer residents of the state, or who have no tax liability, to be paid in whole to such plaintiffs or their estates. The trial court ordered the remaining fifteen percent to be "paid by defendants into a common fund administered by the Court for the payment of plaintiffs' attorney's fees, costs of litigation, costs of administration, fees and expenses incurred by the special master and reimbursement of named plaintiffs for travel and expenses."

The "common-fund doctrine" is a long-standing exception to the general rule in this country that every litigant is responsible for his or her own attorney's fees. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 681-82 (1980); *Horner v. Chamber of Commerce*, 236 N.C. 96, 97, 72 S.E.2d 21, 22 (1952); 20 Am. Jur. 2d *Costs* § 66, at 60 (1995). Attorney's fees are ordinarily taxable as costs only when authorized by statute. *Horner*, 236 N.C. at 97, 72 S.E.2d at 22.

However, in *Horner*, the leading North Carolina case regarding the common-fund doctrine, this Court recognized:

> [T]he rule is well established that a court of equity, or a court in the exercise of equitable jurisdiction, may in its discretion, and without statutory authorization, order an allowance for attorney fees to a litigant who at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund or of common property, or who has created at his own expense or brought into court a fund which others may share with him.

*Id.* at 97-98, 72 S.E.2d at 22. The United States Supreme Court noted in the case of *Boeing Co. v. Van Gemert*, "Since the decisions in *Trustees of the Internal Improvement Fund v. Greenough*, [105 U.S. 527, 26 L. Ed. 1157 (1881)], and *Central R.R. & Banking Co. v. Pettus*, [113 U.S. 116, 28 L. Ed. 915 (1885)], this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing*, 444 U.S. at 478, 62 L. Ed. 2d at 681. "This 'rule rests upon the ground that where one litigant has borne the burden and expense of the litigation that has inured to the benefit of others as well as to himself, those who have shared in its benefits should contribute to the expense.' " *Horner*, 236 N.C. at 98, 72 S.E.2d at 22 (quoting 14 Am. Jur. *Costs* § 74, at 47 (1938)).

Defendants do not contend that representative plaintiffs in this case have not "borne the burden and expense of litigation," nor do they contest that if the representative plaintiffs prevail (which they have), others will benefit from their efforts. Instead, defendants suggest a technical interpretation of the doctrine based on a strict application of factual precedents in the case law of this jurisdiction. In the majority of North Carolina cases dealing with the common-fund doctrine, the litigation involved a preexisting fund of money or piece of real estate. *See, e.g., Horner*, 236 N.C. 96, 72 S.E.2d 21 (common-fund doctrine applicable to recovery of improper donation of city funds challenged by representative plaintiff); *Raleigh-Durham Airport Auth. v. Howard*, 88 N.C. App. 207, 363 S.E.2d 184 (1987), *disc. rev. denied*, 322 N.C. 113, 367 S.E.2d 916 (1988) (common-fund doctrine applicable to increase of condemnation proceeds resulting from plaintiff's suit). As such, defendants argue the relief plaintiffs seek does not qualify for application of the common-fund doctrine

## BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

because plaintiffs' tax credits or refunds constitute separate individual claims and not a single "fund." We disagree.

The primary problem faced by courts in determining whether a shifting of fees is appropriate under the common-fund doctrine is deciding whether some finite benefit flows to a determinable group of plaintiffs. If the benefit reaped by the representative plaintiffs merely "vindicate[s] a general social grievance," *Boeing*, 444 U.S. at 479, 62 L. Ed. 2d at 682, or redounds to the benefit of the public at large, then the common-fund doctrine will not operate to shift the burden of attorney's fees, *id*. However, in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 44 L. Ed. 2d 141 (1975), the Supreme Court noted that the common-fund doctrine has been appropriately applied in cases (1) where the classes of persons benefitting from the lawsuit were small and easily identifiable, (2) where the benefits could be traced accurately, and (3) where the costs could be shifted to those benefitting with some precision. *Id*. at 264 n.39, 44 L. Ed. 2d at 157-58 n.39. In *Boeing*, the Supreme Court used these principles to hold that the common-fund doctrine was properly applied in a class-action suit by Boeing bondholders. In analyzing the application of the common-fund doctrine, the Court stated:

> the criteria [for appropriate fee-shifting cases] are satisfied when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf. Once the class representatives have established the defendant's liability and the total amount of damages, members of the class can obtain their share of the recovery simply by proving their individual claims against the judgment fund. . . . Although the full value of the benefit to each absentee member cannot be determined until he presents his claim, a fee awarded against the entire judgment fund will shift the costs of litigation to each absentee in the exact proportion that the value of his claim bears to the total recovery.

*Boeing*, 444 U.S. at 479, 62 L. Ed. 2d at 682. Although the common-fund doctrine is particularly applicable to cases involving preexisting funds, trusts or real estate parcels, nothing precludes application of the doctrine to funds that arise as a result of the litigation and otherwise meet the above requirements. In fact, this Court expressly authorized such application in *Horner* when it stated that the common-fund doctrine is appropriate in cases where a plaintiff "has *created* at his own expense *or brought into court* a fund which oth-

ers may share with him." *Horner*, 236 N.C. at 98, 72 S.E.2d at 22 (emphasis added); *see also Faulkenbury*, 345 N.C. 683, 483 S.E.2d 422 (holding that the common-fund doctrine applied to a change in calculation of benefits under the State's retirement system resulting in the creation of a recovery fund).

In the present case, the named plaintiffs have recovered a determinate fund for the benefit of every member of the class whom they represent. The defendants' liability has been proven. The qualifications for class membership have been established, and the formula for computing individual refunds has been set. Thus, the judgment fund itself is a quantifiable sum that has been created by the litigation undertaken by the representative plaintiffs. All the remaining class beneficiaries need to do in order to recover their proper refund or credit is to prove their individual claims against the judgment fund. As such, we are persuaded that the recovery at issue in this case properly constitutes a common fund for purposes of shifting attorney's fees under the common-fund doctrine of *Horner* and its progeny. As the Supreme Court stated in *Boeing*:

> Unless absentees contribute to the payment of attorney's fees incurred on their behalves, they will pay nothing for the creation of the fund and their representatives may bear additional costs. The judgment entered . . . rectifies this inequity by requiring every member of the class to share attorney's fees to the same extent that he can share the recovery. Since the benefits of the class recovery have been "traced with some accuracy" and the costs of recovery have been "shifted with some exactitude to those benefiting," *Alyeska Pipeline Service Co.*, [421 U.S.] at 265, n.39, 44 L. Ed. 2d [at 157, n.39] we conclude that the attorney's fee award in this case is a proper application of the common-fund doctrine.

*Boeing*, 444 U.S. at 480-81, 62 L. Ed. 2d at 683 (footnote omitted).

Moreover, N.C.G.S. § 6-20 provides, "In other actions, costs may be allowed or not, in the discretion of the court, unless otherwise provided by law." N.C.G.S. § 6-20 (1997). If an action is equitable in nature, the taxing of the costs is within the discretion of the court, and the court may allow costs in favor of one party or the other or require the parties to share the costs. *Hoskins v. Hoskins*, 259 N.C. 704, 707, 131 S.E.2d 326, 328 (1963). The present case involves not only plaintiffs' request for refund of improper taxation, but also their demand for performance of the State's contractual obligations and an injunction against future collection via a ruling of unconstitutionality.

Thus, this case is equitable in nature. The trial court acted within its discretion in the awarding of attorney's fees to the representative plaintiffs through the creation of a common fund. This assignment of error is overruled.

## V. PLAINTIFF CLASS MEMBERSHIP

[8] The final issue to be addressed is the proper composition of the plaintiff class. Plaintiffs contend the trial court erred by ordering refunds only to those taxpayers who complied with the protest requirements of N.C.G.S. § 105-267. Here, the basic question is whether a refund of taxes paid, pursuant to an unlawful tax, is available only to those taxpayers who complied precisely with the procedural steps of N.C.G.S. § 105-267 or to all taxpayers who wrongfully had their benefit contracts impaired by the State. Fundamental fairness would seem to dictate an easy answer—the State should not profit from the collection of a tax which it was prohibited by our state and federal Constitutions from imposing in the first place. However, the resolution of this issue is complicated by our previous holdings in *Bailey I* and *Swanson*.

In *Bailey I*, this Court held that the case brought by the present plaintiffs should be dismissed because plaintiffs failed to pay the disputed tax first and then seek a refund in accordance with section 105-267 before bringing their constitutional challenge. (Plaintiffs subsequently met the requirements of section 105-267, resulting in the present case.) This Court stated: "When a tax is challenged as unlawful rather than excessive or incorrect, the appropriate remedy is to bring suit under N.C.G.S. § 105-267. '[A] constitutional defense to a tax does not exempt a plaintiff from the mandatory procedure for challenging the tax set out in N.C.G.S. § 105-267.' " *Bailey I*, 330 N.C. at 235, 412 S.E.2d at 300 (quoting *47th Street Photo Inc. v. Powers*, 100 N.C. App. 746, 749, 398 S.E.2d 52, 54 (1990), *appeal dismissed and disc. rev. denied*, 329 N.C. 268, 407 S.E.2d 835 (1991)). In *Swanson*, this Court held that class plaintiffs had not stated a claim because none of the demand letters sent to the Department of Revenue included information regarding any individual class member's claim as required by section 105-267. This Court, in *Swanson*, also upheld the constitutionality of the procedure in section 105-267 as measured by the requirements of due process, holding, "Denial of refunds to taxpayers for the tax years for which they failed to comply with this procedure does not . . . deprive these taxpayers of constitutional due process." *Swanson*, 335 N.C. at 687, 441 S.E.2d at 545.

In the case *sub judice*, defendants cite these authorities for the contention that a refund should be limited only to those taxpayers who complied with the protest procedures of section 105-267. However, close examination of the predicate for these holdings in *Bailey I* and *Swanson* undermines defendants' analysis.

First, the foundation upon which this Court's rather sweeping statement in *Bailey I* was premised has been undercut by the United States Supreme Court. Citing as authority the decision in *Coca-Cola Co. v. Coble*, 293 N.C. 565, 238 S.E.2d 780 (1977), this Court stated, "Absent protest in the form of a demand for refund, a tax is voluntarily paid, and 'voluntary payments of unconstitutional taxes are not refundable.'" *Bailey I*, 330 N.C. at 236, 412 S.E.2d at 301 (quoting *Coca-Cola*, 293 N.C. at 569, 238 S.E.2d at 783). A close and realistic examination of taxation procedure in this state reveals this reasoning to be suspect, particularly in light of the circumstances here. North Carolina does not provide taxpayers with any predeprivation procedures for determining the propriety or legality of a tax. Individuals who challenge tax liability must first pay the disputed amount and then petition the Department of Revenue for a refund of the amount in question. Individuals who do not pay taxes assessed, disputed or not, are subject to a myriad of the State's coercive powers, including fines and forfeiture. Under such circumstances, it would be generous at best to characterize the payment of a disputed tax as "voluntary." The United States Supreme Court, in the case of *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 110 L. Ed. 2d 17 (1990), a case decided after this Court's 1977 opinion in *Coca-Cola*, stated:

> We have long held that, *when a tax is paid in order to avoid financial sanctions or a seizure of real or personal property, the tax is paid under "duress"* in the sense that the State has not provided a fair and meaningful predeprivation procedure. Justice Holmes suggested in *Atchison, T. & S.F. [Ry.] Co. v. O'Connor*, 223 U.S. 280, 56 L. Ed. 436 (1912), that a taxpayer pays "under duress" when he proffers a timely payment merely to avoid a "serious disadvantage in the assertion of his legal . . . rights" should he withhold payment and await a state enforcement proceeding in which he could challenge the tax scheme's validity "by [defense] in the suit." *Id.* at 286, 56 L. Ed. [at 438].

> In contrast, if a State chooses not to secure payments under duress and instead offers a meaningful opportunity for taxpayers

to withhold contested tax assessments and to challenge their validity in a predeprivation hearing, payments tendered may be deemed "voluntary."

*McKesson Corp.*, 496 U.S. at 39 n.21, 110 L. Ed. 2d at 37 n.21 (citations omitted) (emphasis added). This logic eviscerates the conclusion of *Bailey I* that a tax is paid voluntarily "absent protest" and, without such voluntary payment, is not refundable even though the tax is unconstitutional. *Bailey I*, 330 N.C. at 236, 412 S.E.2d at 301.

Once this conclusion in *Bailey I* is removed, a thorough reading of the cases suggests that the procedural requirements of section 105-267 are intended only to establish the parameters within which a contested tax case must arise, not to preclude recovery for those determined via the resulting case to have been unconstitutionally taxed. Neither *Bailey I* nor *Swanson* reached the substantive merits of the respective cases. They addressed only the procedural stances under which each arose. In both cases, the plaintiffs were barred from reaching the merits because of this Court's holding of procedural infirmities resulting from failure to comply with section 105-267 and regulations promulgated thereunder. Neither decision addressed the issue of what effect section 105-267 had on remedies for taxpayers deemed to have been taxed unconstitutionally once a suit was properly filed within the requirements of section 105-267.

To determine the appropriate application of *Bailey I* and *Swanson*, we must examine the rationales underlying the Court's decisions. In both cases, the Court stated that the reason for the requirements of section 105-267 was the fiscal stability of the State. In *Bailey I*, the Court stated:

> Reasons for requiring that refund demands include the information identified by the Secretary of Revenue evidently spring from a concern for the stability of the fisc:
>
> Where protest has been interposed, the [taxing authority] is notified that it may be obliged to refund the taxes and is required to be prepared to meet that contingency. If no protest has been lodged, it is generally assumed that taxes paid can be retained to meet authorized public expenditures, and financial provision is not made for contingent refunds.

*Bailey I*, 330 N.C. at 238, 412 S.E.2d at 302 (quoting *Conklin v. Town of Southampton*, 141 A.D.2d 596, 598, 529 N.Y.S.2d 517, 519 (1988)).

In *Swanson*, this Court quoted the above passage from *Bailey I*, as well as the following statement from the United States Supreme Court: " 'The State's ability in the future to invoke such procedural protections suffices to secure the State's interest in stable fiscal planning . . . .' " *Swanson*, 335 N.C. at 687, 441 S.E.2d at 545 (quoting *McKesson Corp.*, 496 U.S. at 45, 110 L. Ed. 2d at 41).

Thus, according to *Bailey I* and *Swanson*, the purpose underlying the requirements of section 105-267 is to put the State on *notice* that a tax, or a particular application thereof, is being challenged as improper so that the State might properly budget or plan for the potential that certain revenues derived from such tax have to be refunded. Such an understanding affirms, and at the same time limits, the sweeping statement that even claims of unconstitutional taxation are subject to the procedural requirements of section 105-267. While claims of improper or illegal taxation, even on constitutional grounds as held in *Bailey I*, are subject to the procedural requirements of section 105-267, this is only to the extent necessary to provide the State with the notice sufficient to protect fiscal stability.

Notice for fiscal planning purposes is the touchstone of the section 105-267 requirements. In this case, plaintiffs met the requirements for filing suit under section 105-267. As of the first protest received in accordance with section 105-267, not to mention the first lawsuit filed thereafter, the State has been aware of a constitutional challenge to the validity of the Act. The State, through its agents, manages the various Retirement Systems. As a result, the State is or should be fully aware of the number of retirees whose benefits vested prior to 12 August 1989, as well as the amount of benefits paid to those retirees. Therefore, the State had notice that the Act was potentially unconstitutional and had the opportunity to budget for such a contingency. The purpose of the statute was realized.

We have determined in this case that the State acted unconstitutionally by impairing the contracts and taking without just compensation the property of state and local government employees whose retirement benefits vested on or before 12 August 1989. Such a determination does not discriminate between those who protested and those who did not. The State unconstitutionally collected taxes from *all* of these individuals. It would be unjust to limit recovery only to those taxpayers with the advantage of technical knowledge and foresight to have filed a formal protest and demand for refund. Such a result would clearly elevate form over substance. This is especially

**BAILEY v. STATE OF NORTH CAROLINA**

[348 N.C. 130 (1998)]

untenable in a case such as this, where the matter is of constitutional import and where, in practical consequence, the purpose of the statute was realized. Further, this more expansive, inclusive determination would seem to comport with the language and spirit of section 105-267, which provides: "If upon the trial it is determined that all or part of the tax was levied or assessed for an illegal or unauthorized purpose, . . . judgment shall be rendered therefor, with interest, and the judgment shall be collected as in other cases. The amount of taxes for which judgment is rendered in such an action shall be refunded by the State." N.C.G.S. § 105-267.

Thus, as to this issue, we hold that section 105-267 does not shield the State from refunding money collected to all taxpayers unconstitutionally taxed by the Act and that the trial court erred by limiting relief only to those taxpayers who protested in accordance with section 105-267. To the extent that our rulings in *Bailey I* and *Swanson* imply otherwise, they are hereby disavowed.

For the foregoing reasons, we affirm the trial court's holding that the Act is unconstitutional as an improper impairment of contract and a taking of property without just compensation, and we also affirm the trial court's creation of a common fund. However, in light of our holding, we conclude that the trial court erred in its determination that only plaintiffs' retirement benefits attributable to service prior to 12 August 1989 are exempt from state tax and in limiting recovery only to those plaintiffs who complied with section 105-267. We remand the case to the trial court for entry of such further order or orders, consistent with this opinion, as the trial court shall find appropriate with respect to the determination and administration of plaintiffs' class, refunds, and the common fund. We have examined the remaining issues raised by the parties, including the issue of judicial salaries, and conclude we need not now address them in light of the determinations hereinabove set forth.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Justice FRYE concurring in part and dissenting in part.

This Court has decided, in two very recent cases, one involving the same parties as in this case, that the protest requirements of N.C.G.S. § 105-267 are valid. I cannot join the majority in overruling those cases today. Accordingly, I dissent from the portion of the majority opinion dealing with the protest requirements of N.C.G.S. § 105-267.

BAILEY v. STATE OF NORTH CAROLINA

[348 N.C. 130 (1998)]

Justice WEBB concurring in part and dissenting in part.

I dissent from the portion of the majority opinion dealing with the protest requirements of N.C.G.S. § 105-267, which, when this action was filed, said:

> No court of this State shall entertain a suit of any kind brought for the purpose of preventing the collection of any tax imposed in this Subchapter. Whenever a person shall have a valid defense to the enforcement of the collection of a tax assessed or charged against him or his property, such person shall pay such tax to the proper officer, and such payment shall be without prejudice to any defense of rights he may have in the premises. At any time within 30 days after payment, the taxpayer may demand a refund of the tax paid in writing from the Secretary of Revenue and if the same shall not be refunded within 90 days thereafter, may sue the Secretary of Revenue in the courts of the State for the amount so demanded. Such suit may be brought in the Superior Court of Wake County, or in the county in which the taxpayer resides at any time within three years after the expiration of the 90-day period allowed for making the refund. If upon the trial it shall be determined that such a tax or any part thereof was levied or assessed for an illegal or unauthorized purpose, or was for any reason invalid or excessive, judgment shall be rendered therefor, with interest, and the same shall be collected as in other cases. The amount of taxes for which judgment shall be rendered in such action shall be refunded by the State; provided, nothing in this section shall be construed to conflict with or supersede the provisions of G.S. 105-241.2.

N.C.G.S. § 105-267 (1989) (amended 1996).

I do not see how the language of this section could be more clear that an action may not be brought to prevent the collection of certain taxes, including the taxes involved in this case. The section further clearly says that the only way to test the imposition of these taxes is to pay them to the proper officer and file a protest within thirty days of payment.

In holding that a protest was not necessary in this case, I believe the majority has violated the first rule of statutory construction, which is that when the language of a statute is unambiguous and clear, there is no room for judicial construction, and a court must give the statute its plain and definite meaning. *State ex rel. Utilities Comm'n v. Edmisten*, 291 N.C. 451, 232 S.E.2d 184 (1977).

The majority says that reaching the result in this case was complicated by *Swanson v. North Carolina*, 335 N.C. 674, 441 S.E.2d 537, *cert. denied*, 513 U.S. 1056, 130 L. Ed. 2d 598 (1994), and *Bailey v. North Carolina*, 330 N.C. 227, 412 S.E.2d 295 (1991), *cert. denied*, 504 U.S. 911, 118 L. Ed. 2d 547 (1992). This complication is understandable in light of the fact that both the cases contain square holdings contrary to the result we have reached today. *Bailey*, of course, involves the very parties and issues involved in this case. The United States Supreme Court has said that our protest payment scheme is not unconstitutional. *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 110 L. Ed. 2d 17 (1990).

In order to avoid the plain meaning of the statute, the majority goes to great lengths to prove (1) that payments under protest are not voluntary, and (2) that the purpose of N.C.G.S. § 105-267 is to provide the State with information as to what revenues it will have for its fiscal needs. The majority says the State should have known what revenues might be available without the protests, and this made it unnecessary to follow section 105-267.

I do not believe the involuntariness of the payments or the purpose behind the statute should be considered in this case. The meaning of the statute is clear. We should not go beyond the plain meaning.

The General Assembly has determined that in order to contest the imposition of a tax, there must be a payment under protest. We should not repeal this action of the General Assembly.