NANCY COCHRAN, Plaintiff v. ROBERT L. COCHRAN, Defendant

No. COA08-697

(Filed 21 July 2009)

**1. Divorce— equitable distribution—valuation of State Retirement System pension—total contribution method—Bishop five-step method**

The trial court did not err in an equitable distribution case by failing to value defendant husband's State Retirement pension based on the total contribution method which uses the total value of contributions made to the plan by or on behalf of the employee because: (1) our Supreme Court has held that the State Retirement System pension is a defined benefit plan; and (2) defined benefit plans should be valued for the purposes of equitable distribution according to a specific five-step method set out in *Bishop*, 113 N.C. App. 725 (1994), rather than the total contribution method.

**2. Divorce— equitable distribution—valuation of State Retirement System pension—Bishop five-step method**

The trial court erred in part in an equitable distribution case by its valuation of defendant husband's State Retirement system pension using the five-step method under *Bishop*, 113 N.C. App. 725 (1994), and the case is remanded for further findings of fact regarding step four because: (1) in regard to the first step, defendant's argument that N.C. Gen. Stat. § 135-5(f) should be used as the basis for calculating his "earliest retirement" date was rejected since the plain language of the statute allows for the return of accumulated contributions only if the State employee terminates his service with the State for reasons other than death or retirement; (2) in regard to the second step determining the employee spouse's life expectancy as of the date of separation and use of this figure to ascertain the probable number of months the employee spouse will receive benefits under the plan, the methodology of plaintiff's expert, a C.P.A. accredited in business valuation and a certified valuation expert, was appropriate when the mortality and interest tables used by the expert were those presently required by the federal government under ERISA, the use of probable life expectancy was a more accurate predictor of actual life expectancy than a mere average, and the expert performed the calculations on a year-by-year basis until there would be no further life expectancy; (3) in regard to the third and fourth steps for the discount rate used in reducing the pension

**COCHRAN v. COCHRAN**

[198 N.C. App. 224 (2009)]

benefits to present value, the trial court's order must be remanded for further findings since it was unclear whether it performed these two steps that are necessary when defendant's earliest retirement date post-dated the date of separation; and (4) in regard to the fifth step requiring the trial court to take into account contingencies such as involuntary or voluntary employee spouse termination and insolvency of the pension plan, defendant failed to show how the trial court abused its discretion since defendant pointed to no evidence suggesting the possibility of any contingencies that could affect the value of defendant's pension.

**3. Divorce— equitable distribution—State Retirement System pension—immediate offset method**

The trial court did not err in an equitable distribution case by using the immediate offset method in distributing defendant husband's pension because: (1) the pension benefits did not represent a disproportionate part of the marital estate when defendant's pension constituted only 41% of the marital estate; (2) ample assets existed to divide the estate and immediately distribute the pension; (3) the trial court awarded defendant all of his pension benefits and then awarded plaintiff a larger portion of the remaining assets as permitted by N.C.G.S. § 50-20.1(a); and (4) defendant was fully vested and currently eligible for early retirement.

**4. Divorce— equitable distribution—unequal division of divisible property**

The trial court did not err in an equitable distribution case by awarding an unequal division of the divisible property because: (1) the trial court made separate specific findings of fact that addressed each of the statutory factors under N.C.G.S. § 50-20(c); (2) the fact that defendant's pension, when received, will constitute taxable income was not a tax consequence resulting from the ordered equitable distribution; and (3) in regard to the evidence that plaintiff would not be taxed on any gain received upon a sale of the marital home, the evidence presented was merely a speculative tax consequence since there was no evidence that any such sale would be necessary or was imminent. In regard to the finding of fact that plaintiff contributed $70,000 of her separate property when the marital home was purchased, the trial court is free on remand to revisit this issue and determine whether this evidence should be considered as a distributional factor.

**5. Divorce— equitable distribution—separate checking account—failure to rebut presumption of marital property**

The trial court did not err in an equitable distribution case by classifying a checking account held in defendant husband's name only as marital property because defendant failed to rebut by the greater weight of the evidence the presumption that it was marital property.

Judge WYNN concurring.

Appeal by defendant from order entered 20 December 2007 by Judge Laura Powell in Rutherford County District Court. Heard in the Court of Appeals 27 January 2009.

*Taylor & Brown, P.A., by Lee F. Taylor, for plaintiff-appellee.*

*Dameron, Burgin, Parker & Jackson, P.A., by Phillip T. Jackson and Aaron G. Walker, for defendant-appellant.*

GEER, Judge.

Defendant Robert L. Cochran appeals from the trial court's equitable distribution order. On appeal, Mr. Cochran primarily contends that the trial court erred in valuing his pension. According to Mr. Cochran, the trial court failed to follow the five-step procedure for pension valuation mandated by *Bishop v. Bishop*, 113 N.C. App. 725, 440 S.E.2d 591 (1994). Although we hold that the trial court complied with certain steps set out in *Bishop*, we are unable to determine from the trial court's order or the record whether it complied with other steps. We, therefore, vacate the order and remand for further proceedings.

Facts

Plaintiff Nancy Cochran and Mr. Cochran married in 1989, separated in 2005, and divorced in 2006. Mr. Cochran worked as a State Highway Patrolman, and as of the date of separation, had participated in the Teachers' and State Employees' Retirement System ("State Retirement System") for 17.1287 years.

Following an equitable distribution hearing, the trial court entered an order classifying, valuating, and distributing the parties' marital estate. The trial court concluded that an unequal division was equitable in the case. Under the order, Ms. Cochran received $256,561.00, including the marital residence (valued at $131,548.69), the divisible property resulting from the increase in the value of the marital residence (amounting to $20,400.00), Mr. Cochran's 401(k) (valued at

$97,385.75), her own 401(k) (valued at $15,527.10), and various items of personal property. Mr. Cochran received $241,898.00, composed of his pension through the State Retirement System (valued at $203,324.00), life insurance policies (valued at $23,775.17), a checking account (containing $3,389.21), and other items of personal property. The trial court ordered Ms. Cochran to pay Mr. Cochran a distributive award in the amount of $14,663.00.

Subsequently, on 20 December 2007, the trial court entered an amended equitable distribution order that corrected a "calculation error" in determining the amount of Mr. Cochran's distributive award and reduced that award to $7,331.00. Mr. Cochran timely appealed from the amended equitable distribution order.

### Discussion

"A trial judge is required to conduct a three-step analysis when making an equitable distribution of the marital assets. These steps are: (1) to determine which property is marital property, (2) to calculate the net value of the property, fair market value less encumbrances, and (3) to distribute the property in an equitable manner." *Beightol v. Beightol*, 90 N.C. App. 58, 63, 367 S.E.2d 347, 350, *disc. review denied*, 323 N.C. 171, 373 S.E.2d 104 (1988). On appeal, Mr. Cochran contends the trial court erred (1) in its valuation of Mr. Cochran's pension, (2) in using the immediate offset method to distribute Mr. Cochran's pension, (3) in awarding an unequal distribution of marital property, and (4) in determining that a checking account in Mr. Cochran's name was marital property.

I

[1] Mr. Cochran first argues that the trial court erred by not valuing his pension based on the total value of contributions made to the plan by or on behalf of the employee—a valuation approach called the "total contribution method." We disagree.

Generally, there are two types of pension plans: defined contribution plans and defined benefit plans. "In a defined benefit plan the employee's pension is determined without reference to contributions [by the employee] and is based on factors such as years of service and compensation received." *Seifert v. Seifert*, 82 N.C. App. 329, 333, 346 S.E.2d 504, 506 (1986), *aff'd*, 319 N.C. 367, 354 S.E.2d 506 (1987). Conversely, a defined contribution plan is "essentially an annuity funded by periodic contributions" from the employee, the employer, or both. *Id.* at 332, 346 S.E.2d at 505.

Our Supreme Court has held that the State Retirement System pension is a defined benefit plan. *Bailey v. State*, 348 N.C. 130, 136, 500 S.E.2d 54, 57 (1998) (classifying the State Retirement System as part of the mandatory benefit system). In *Bishop*, this Court held that defined benefit plans should be valued for the purposes of equitable distribution according to a specific five-step method rather than the "total contribution method" advocated by Mr. Cochran. Indeed, this Court has consistently applied the *Bishop* method in valuing pension plans for the purposes of equitable distribution. *See, e.g., Cunningham v. Cunningham*, 171 N.C. App. 550, 615 S.E.2d 675 (2005); *Surrette v. Surrette*, 114 N.C. App. 368, 442 S.E.2d 123 (1994). Accordingly, we hold that the trial court did not err in declining to use the total contribution method in valuing Mr. Cochran's pension.

II

[2] Mr. Cochran next argues that the trial court erred in its valuation of his State Retirement System pension by not properly following the five-step method set out in *Bishop*. This Court in *Bishop* set out the following requirements for valuing a "defined benefit" pension plan:

*First*, the trial court must calculate the amount of monthly pension payment the employee, assuming he retired on the date of separation, will be entitled to receive at the later of the earliest retirement age or the date of separation. This calculation must be made as of the date of separation and "shall not include contributions, years of service or compensation which may accrue after the date of separation." N.C.G.S. § 50-20(b)(3). The calculation will however, include "gains and losses on the prorated portion of the benefit vested at the date of separation." *Id. Second*, the trial court must determine the employee-spouse's life expectancy as of the date of separation and use this figure to ascertain the probable number of months the employee-spouse will receive benefits under the plan. *Third*, the trial court, using an acceptable discount rate, must determine the then-present value of the pension as of the later of the date of separation or the earliest retirement date. *Fourth*, the trial court must discount the then-present value to the value as of the date of separation. In other words, determine the value as of the date of separation of the sum to be paid at the later of the date of separation or the earliest retirement date. This calculation requires mortality and interest discounting. *See* [3 William M. Troyan, et al., *Valuation & Distribution of Marital Property*] § 45.23. The mortality and interest tables of the Pension Benefit Guaranty

Corporation, a corporation within the United States Department of Labor, are well suited for this purpose. *Id.* *Finally,* the trial court must reduce the present value to account for contingencies such as involuntary or voluntary employee-spouse termination and insolvency of the pension plan. This calculation cannot be made with reference to any table or chart and rests within the sound discretion of the trial court.

*Bishop,* 113 N.C. App. at 731, 440 S.E.2d at 595-96 (emphasis added).

A. *First Step*

With respect to the first step of *Bishop,* Mr. Cochran argues initially that the trial court did not properly determine his earliest retirement date. This date is critical to subsequent steps. The trial court found that "[t]he earliest retirement age under the plan is 50 years therefore the years to earliest retirement as of the date of separation is 1.97 years."

Mr. Cochran contends that the correct "earliest retirement" date is 60 days from the date of separation or 12 September 2005. In making this argument, Mr. Cochran points to N.C. Gen. Stat. § 135-1(20) (2007), which defines " '[r]etirement' [to] mean[] the termination of employment and the complete separation from active service with no intent or agreement, express or implied, to return to service." Mr. Cochran then argues that under N.C. Gen. Stat. § 135-5(f), if a member of the pension plan ceases to be a State employee, he or she may receive, no sooner than 60 days after ceasing to be a State employee, his or her contributions and, if vested, the interest accumulated on those contributions. Mr. Cochran concludes that given the definition of "retirement," set out in N.C. Gen. Stat. § 135-1(20), N.C. Gen. Stat. § 135-5(f), which discusses return of contributions upon termination of employment, should be understood as specifying the earliest retirement date.

Mr. Cochran has, however, overlooked the actual language of N.C. Gen. Stat. § 135-5(f), which explicitly states:

Should a member cease to be a teacher or State employee *except by death or retirement* under the provisions of this Chapter, he shall upon submission of an application be paid, not earlier than 60 days from the date of termination of service, his contributions, and if he has attained at least five years of membership service or if termination of his membership service is involuntary as certified by the employer, the accumulated regular interest thereon, provided that he has not in the meantime returned to service.

(Emphasis added.) Thus, the plain language of section 135-5(f) allows for the return of accumulated contributions only if the State employee terminates his service with the State for reasons *other than* death or retirement.

Accordingly, we reject Mr. Cochran's argument that N.C. Gen. Stat. § 135-5(f) should be used as the basis for calculating his "earliest retirement" date. The trial court properly determined Mr. Cochran's earliest retirement date for purposes of valuing the State Retirement System pension.

B. *Second Step*

Defendant next contends that the trial court violated the second step's mandate that the trial court "determine the employee-spouse's life expectancy as of the date of separation and use this figure to ascertain the probable number of months the employee-spouse will receive benefits under the plan." *Bishop*, 113 N.C. App. at 731, 440 S.E.2d at 595-96. Defendant argues that "[t]here is no finding of fact or conclusion of law in the Order in which the trial court states what it determined 'the employee-spouse's life expectancy [to be] as of the date of separation' " or any "finding of fact or conclusion of law in which the trial court determined the 'probable number of months the employee-spouse will receive benefits under the plan' as required by Step 2 of the *Bishop* methodology."

At bottom, defendant's arguments rest on a rather literal reading of *Bishop*. According to defendant, the trial court must calculate life expectancy in only one manner such that a specific finding of fact may be made regarding the likely number of months that an employee-spouse will receive pension benefits. We are not convinced that the *Bishop* standard must be so inflexibly and mechanically applied without consideration of the ultimate focus of the process outlined in *Bishop*.

The first four steps of *Bishop* provide a method for determining a lump sum present value of the stream of payments that the employee-spouse will likely receive under the pension plan from the earliest date of his retirement through his projected life expectancy (determined as of the date of separation). The fifth step allows the trial court to further reduce this figure "to account for contingencies such as involuntary or voluntary employee-spouse termination and insolvency of the pension plan." *Id.*, 440 S.E.2d at 596. Thus, only the first four steps relate to the present value calculation that Mr. Cochran is challenging on appeal. This Court summarized, with respect to these four steps, that "[t]his cal-

culation requires mortality and interest discounting. The mortality and interest tables of the Pension Benefit Guaranty Corporation, a corporation within the United States Department of Labor, are well suited for this purpose." *Id.* (internal citation omitted).

For purposes of valuing the State Retirement System pension, the trial court in this case relied upon the testimony and report of Ms. Cochran's expert, Foster Shriner, a C.P.A. accredited in business valuation and a certified valuation analyst. Mr. Shriner explained generally in his written report that his method of valuing the pension "incorporat[ed] those factors relevant to discount rates and mortality as prescribed by Section 2619 of the Employers Retirement Security Act of 1974, Section 3(2) (P.L. 93-406) (ERISA), the amendments provided by the Uruguay Round Agreements Act (P.L. 103-465) (GATT) and the Pension Funding Equity Act of 2004." In the section of the report setting out the precise methodology that he used, Mr. Shriner wrote: "To determine the actuarial present value, a combination of factors must be employed. First, an appropriate discount rate must be utilized, and secondly, mortality tables must be incorporated." Mr. Shriner similarly testified that when faced with a stream of payments over time, to value it, "you have to have a discount rate and a mortality table."

Thus, Mr. Shriner's methodology specifically relied upon the two factors identified by this Court in *Bishop* as necessary for calculating the value of the pension: "mortality and interest discounting." *Id.* Moreover, Mr. Shriner, in applying the mortality and interest discounting, relied upon the tables currently mandated for use under ERISA in valuing pensions. The "mortality and interest tables of the Pension Benefit Guaranty Corporation" referenced in *Bishop*, *id.*, were adopted for use in connection with ERISA plans. The tables in existence as of the date of *Bishop* have been, as explained by Mr. Shriner, superceded, for purposes of ERISA pension plan valuation, by the tables upon which Mr. Shriner relied through the enactment of federal legislation.

We do not believe that *Bishop* intended to preclude pension valuers from using updated and more sophisticated tables adopted by the Department of Labor for use with ERISA plans. *Bishop* cannot mean that for purposes of pension valuation, North Carolina is frozen in 1994. Instead, we hold that by approving use of the Pension Benefit Guaranty Corporation's mortality and interest tables, the Court pointed pension valuers to the tables being used for ERISA valuations.

Consistent with *Bishop*, Mr. Shriner used the tables presently required by the federal government under ERISA. In using those tables,

Mr. Shriner specifically determined Mr. Cochran's life expectancy. Although Mr. Cochran contends that the reference to "life expectancy" means average life expectancy rather than "probable life expectancy," as determined in the tables relied upon by Mr. Shriner, nothing in *Bishop* precludes use of probable life expectancy—a more accurate predictor of actual life expectancy than a mere average. Indeed, the *Bishop* opinion requires that the court use the life expectancy to "ascertain the *probable* number of months the employee-spouse will receive benefits under the plan." *Id.* (emphasis added). That is precisely what Mr. Shriner did in using the federal GATT mortality table, called the "1994 Group Reserving Table" or "94 GAR."

Nonetheless, Mr. Cochran urges that, under *Bishop*, the trial court was required to come up with a specific number of months, multiply it by the expected benefit, and then discount the overall amount to determine present value. Mr. Shriner, however, looked at each year's pension payments, starting with the earliest retirement date, multiplied those payments by a mortality factor (the probability of life expectancy for that year), and then reduced that year's payments to present value with a discounting factor. In other words, Mr. Shriner performed precisely the calculations mandated by *Bishop* on a year-by-year basis until there would be no further life expectancy.

Nothing in *Bishop* precludes this approach as opposed to the more generalized approach urged by Mr. Cochran. Indeed, Mr. Shriner's approach actually resulted in a lower life expectancy and lower projected stream of payments. The increase in the value of the pension determined by Mr. Shriner was due to the discounting interest rate used by Mr. Shriner and not his calculation of life expectancy.

We note that Mr. Cochran's expert witness, Ronald Carland, agreed that the ERISA approach, using GATT and GAR, is "an established incontrovertible way to value a pension plan." We believe such an approach complies with the intent of this Court in *Bishop*, especially in light of the Court's approval of the Pension Benefit Guaranty Corporation's tables and the opinion's expressed "belie[f] that consistency in valuation methods is important."[1] *Id.*, 440 S.E.2d at 595. We, therefore, hold that the trial court properly applied Step two of *Bishop* when adopting Mr. Shriner's methodology. We further hold that the trial court's finding of fact setting out this methodology is sufficient to comply with *Bishop*.

---

1. Mr. Cochran's expert witness also confirmed that the GATT rate and mortality tables were "more science than art," while his own approach was "more art than science."

C. *Steps Three and Four*

Mr. Cochran next challenges the discount rate used in reducing the pension benefits to present value. The trial court, relying upon Mr. Shriner's testimony, adopted the GATT rate of 5.6% as the appropriate discount rate for present value purposes. The court then, however, based on Mr. Shriner's testimony, reduced that rate based on the assumption that Mr. Cochran would annually receive a 2.0% cost of living adjustment ("COLA"), which resulted in a COLA adjusted GATT rate of 3.5%.

Mr. Cochran points to the provision in N.C. Gen. Stat. § 50-20.1(d) (2007), relating to the award in equitable distribution of pension and retirement benefits, that "[t]he award shall be based on the vested and nonvested accrued benefit, as provided by the plan or fund, calculated as of the date of separation, *and shall not include contributions, years of service, or compensation which may accrue after the date of separation.*" (Emphasis added.) Mr. Cochran, however, overlooks the next sentence in N.C. Gen. Stat. § 50-20.1(d): "The award shall include gains and losses on the prorated portion of the benefit vested at the date of separation."

Here, the COLA, which Mr. Shriner determined conservatively to be 2.0% a year, amounts to an increase in the pension benefit being received. The COLA is not a contribution to the plan or compensation being paid after the date of separation. It is instead a gain on the benefit vested at the time of separation. The trial court was, therefore, required to take it into account under N.C. Gen. Stat. § 50-20.1(d). *See also Bishop*, 113 N.C. App. at 731, 440 S.E.2d at 595 (noting that calculation of amount of monthly payments to be received in future must include any gains and losses on portion of benefit vested at date of separation). Mr. Cochran does not make any argument that the court erred in taking the COLA into account through the discount rate as opposed to using it in calculating the expected benefits and, therefore, we do not address that issue.

Step three of *Bishop* requires that the trial court, using the discount rate, determine present value "of the pension as of the later of the date of separation or the earliest retirement date." Step four then adds the final step of discounting that present value figure "to the value as of the date of separation." Mr. Cochran's earliest retirement date post-dated the date of separation and, therefore, *Bishop* required that the trial court perform both Step three and Step four. Because it is not apparent from the trial court's order that it did so, we must remand for further findings of fact.

**COCHRAN v. COCHRAN**

[198 N.C. App. 224 (2009)]

The trial court's order finds: "Using the 94 Group Annuity Reserving Table, which the court finds is an appropriate method of determining life expectancy[,] the court finds that the actuarial present value of the defined benefit plan of $1,016.12 per month beginning on the earliest retirement date of July 25, 2007 is $215,225." This finding of fact does not specifically state whether the present value was being determined as of the earliest retirement date or the date of separation. Mr. Shriner's testimony and report, on which this finding of fact is based, suggests that the $215,225 constituted the present value as of the date of separation. If that was the intended finding of the trial court—something as to which we can only speculate—then the trial court skipped Step three of *Bishop* and may have calculated an incorrect value as of the date of separation. If the finding is really the trial court's determination as of the date of earliest retirement, then the trial court never found a value as of the date of separation.

Because *Bishop* is controlling, it does not matter whether Mr. Shriner or other valuation experts would not usually include these two steps. While Mr. Shriner was asked by counsel to determine the present value as of the date of separation, the trial court, under *Bishop*, should have determined it as of the earliest retirement date—Step three of *Bishop*. Then, that figure would have to be reduced to present value as of the date of separation—Step four of *Bishop*. Because the trial court did not clearly comply with the third and fourth steps of *Bishop*, we must remand for further findings of fact. We leave to the discretion of the trial court whether to receive more evidence on this issue.

D. *Step Five*

Finally, with respect to the valuation, Mr. Cochran contends that the trial court failed to follow Step five of the *Bishop* methodology, requiring that the trial court take into account contingencies such as involuntary or voluntary employee-spouse termination and insolvency of the pension plan. *Bishop* holds that "[t]his calculation cannot be made with reference to any table or chart and rests within the sound discretion of the trial court." 113 N.C. App. at 731, 440 S.E.2d at 596. Mr. Cochran must, therefore, demonstrate that the trial court abused its discretion in not reducing the present value based on such contingencies.

Mr. Cochran, however, points to no evidence in the record suggesting the possibility of any contingencies that could affect the value of Mr. Cochran's pension. Since Mr. Cochran was fully vested in his pension, the possibility of termination was immaterial. Further, Mr. Cochran made no showing and has made no argument that a risk of insolvency

exists for the State Retirement System pension plan. Accordingly, Mr. Cochran has failed to demonstrate that the trial court abused its discretion in not further reducing the pension value to account for contingencies of the type discussed in Step five of *Bishop*.

## III

**[3]** Mr. Cochran next contends that the trial court erred in using the immediate offset method in distributing his pension. In support of this argument, he relies exclusively on *Seifert v. Seifert*, 319 N.C. 367, 354 S.E.2d 506 (1987). In *Seifert*, the Supreme Court held:

> [I]f the marital estate contains adequate property other than the pension and retirement benefits, an in kind or monetary distribution of these assets may be made which takes into account the anticipated pension and retirement benefits. This is impermissible only when the value of the pension or retirement benefits is so disproportionate in relation to other marital property that an immediate distribution would be inappropriate.

*Id.* at 370, 354 S.E.2d at 509. In that case, the Court determined that the trial court should on remand, after calculating the percentage of the pension benefits to which the plaintiff wife was entitled, then "order a deferred award of such benefits payable when defendant-husband actually begins to receive them." *Id.* at 372, 354 S.E.2d at 510.

Mr. Cochran contends that the value of the pension, in this case, was such a disproportionate part of the marital estate that the trial court erred in immediately distributing it. This case does not, however, present the problem present in *Seifert*, where the pension benefits represented a disproportionate share of the marital assets. In *Seifert*, the marital estate contained four assets: $27,000.00 in home equity, $15,475.00 in personal property, the wife's pension valued at $43,284.07, and the husband's pension valued at $108,491.60. *Id.* at 368, 354 S.E.2d at 507-08. As a result, the husband's pension exceeded the value of all other marital assets combined by more than $22,000.00. As a result, there was no way to equally divide the estate and immediately distribute the pension. *Id.* at 371-72, 354 S.E.2d at 510. Here, however, Mr. Cochran's pension constituted only 41% of the marital estate. Ample assets existed to divide the estate and immediately distribute the pension.

Mr. Cochran, however, argues that the pension benefits represent over 80% of the marital assets distributed to him and that the value

awarded to him is a contingent one that may never be received. He points to the Court of Appeals' observation in *Seifert* that

> [t]he major disadvantage of the present value method is that the employee spouse bears the risk of paying the nonemployee spouse for rights that may never mature. Additionally, the employee spouse may feel cheated because he or she receives only an expectancy of benefits while the nonemployee spouse gets present "real" assets such as home equity, stocks or cash payment.

*Seifert*, 82 N.C. App. at 336, 346 S.E.2d at 507-08 (internal citation omitted).

Mr. Cochran overlooks the fact that this portion of the opinion discussed both the advantages and disadvantages of allowing immediate distribution of a pension. Although this Court ultimately determined that the disadvantages outweighed the advantages and that deferred distribution was preferrable, *id.* at 337, 346 S.E.2d at 508, our legislature revisited the issue subsequent to *Seifert* and adopted N.C. Gen. Stat. § 50-20.1(a), which authorizes the result reached in the order entered in this case:

> (a) The award of vested pension, retirement, or other deferred compensation benefits may be made payable:
>
> (1) As a lump sum by agreement;
>
> (2) Over a period of time in fixed amounts by agreement;
>
> (3) By appropriate domestic relations order as a prorated portion of the benefits made to the designated recipient at the time the party against whom the award is made actually begins to receive the benefits; or
>
> (4) *By awarding a larger portion of other assets to the party not receiving the benefits and a smaller share of other assets to the party entitled to receive the benefits.*

(Emphasis added.)

The trial court, here, awarded Mr. Cochran all of his pension benefits and then awarded Ms. Cochran a larger portion of the remaining assets, precisely as permitted by the statute. Especially since Mr. Cochran is fully vested and, in fact, currently eligible for early retirement, we cannot conclude that the trial court erred in making an immediate distribution of the pension benefits.

IV

[4] Mr. Cochran further contends that the trial court erred in awarding an unequal division of the divisible property. Although the trial court awarded the parties an equal portion of the marital assets, it distributed solely to Ms. Cochran the increase in the value of the marital home from the date of separation to the date of distribution. This divisible property was valued at $20,400.00.

As an initial matter, Mr. Cochran contends that the trial court's findings of fact are inadequate because the trial court simply restated the statutory factors set out in N.C. Gen. Stat. § 50-20(c)(1), (3), (4), and (11a) (2007). In the finding cited by Mr. Cochran, finding of fact 75, the trial court stated: "The court considered all of the distributional factors as set out in N.C.G.S. 50-20 and finds that the factors listed below are present and relevant in this case." The court then listed the statutory factors identified in N.C. Gen. Stat. § 50-20(c)(1), (3), (4), and (11a) and added a final one: "The plaintiff contributed $70,000 of her separate property when the marital home was purchased."

As this Court has held, the trial court must "make specific findings of fact regarding each factor specified in N.C. Gen. Stat. § 50-20(c) . . . on which the parties offered evidence." *Embler v. Embler*, 159 N.C. App. 186, 188, 582 S.E.2d 628, 630 (2003). We agree with Mr. Cochran that finding of fact 75, standing alone, would not be sufficient. *See Daetwyler v. Daetwyler*, 130 N.C. App. 246, 249-50, 502 S.E.2d 662, 665 (1998) ("We note that a finding which merely states that 'due regard' has been given to the section 50-20(c) factors, without supporting findings as to the ultimate evidence presented on these factors, is insufficient as a matter of law because such a general finding does not present enough information to allow an appellate court to determine whether evidence presented on each of the section 50-20(c) factors was duly considered by the trial court[.]" (internal citations omitted)), *aff'd per curiam*, 350 N.C. 375, 514 S.E.2d 89 (1999). Finding of fact 75 was not, however, the only finding regarding the distributional factors set out in N.C. Gen. Stat. § 50-20(c). Instead, the trial court made separate, specific findings of fact that addressed each of the statutory factors listed in finding of fact 75 that the trial court found "present and relevant in this case."

Mr. Cochran, however, further argues that the trial court should have made findings of fact regarding distributional factor N.C. Gen. Stat. § 50-20(c)(11), which requires the trial court to consider "[t]he tax consequences to each party, including those federal and State tax consequences that would have been incurred if the marital and divisible prop-

erty had been sold or liquidated on the date of valuation." The sole evidence regarding tax consequences, however, was elicited from Mr. Cochran's expert witness, who testified that if the marital home were sold, the gain received in the sale would not be taxable under certain circumstances. He further testified that Mr. Cochran's pension benefits would be subject to taxation when received.

This Court has, however, construed N.C. Gen. Stat. § 50-20(c)(11) "as requiring the court to consider tax consequences that will result from the distribution of property that the court actually orders." *Weaver v. Weaver*, 72 N.C. App. 409, 416, 324 S.E.2d 915, 920 (1985). The fact that Mr. Cochran's pension, when received, will constitute taxable income is not a tax consequence resulting from the ordered equitable distribution. *See also Smith v. Smith*, 111 N.C. App. 460, 504, 433 S.E.2d 196, 222 (1993) ("[E]ven when evidence pursuant to [N.C. Gen. Stat. § 50-20(c)(11)] is presented, the court is only required to consider the tax consequences that will result from the distribution the court actually orders."), *reversed in part on other grounds*, 336 N.C. 575, 444 S.E.2d 420 (1994).

As for the evidence that Ms. Cochran would not be taxed on any gain received upon a sale of the marital home, since there is no evidence that any such sale would be necessary or is imminent, the evidence presents merely a speculative tax consequence as to which the trial court *may not* make a finding of fact. *See, e.g., Dolan v. Dolan*, 148 N.C. App. 256, 258-59, 558 S.E.2d 218, 220 (holding that trial court erred in making finding as to tax consequences if parties sold rental property because consequences "were hypothetical and speculative" in the absence of finding that parties would be required to liquidate property), *aff'd per curiam*, 355 N.C. 484, 562 S.E.2d 422 (2002); *Crowder v. Crowder*, 147 N.C. App. 677, 683, 556 S.E.2d 639, 643 (2001) ("Valuation of marital property may include tax consequences from the sale of an asset *only* when the sale is imminent and inevitable, rather than hypothetical or speculative.").

Finally, Mr. Cochran argues that the trial court's finding that Ms. Cochran contributed $70,000 of her separate property when the marital home was purchased is not supported by the evidence. We agree that this finding, as set out, is not supported by the evidence. The evidence indicates that Ms. Cochran deposited $125,000.00 of her separate funds into the parties' joint bank account. Mr. Cochran admitted that when the parties purchased their first marital home, the $70,000.00 down payment was obtained substantially from Ms. Cochran's sepa-

rate funds. The parties sold their first home, and $65,236.41 of the proceeds were used to purchase the marital home at issue in the equitable distribution hearing. This evidence does not support a finding that Ms. Cochran contributed $70,000.00 of her separate funds to the purchase of the marital home being distributed in the equitable distribution hearing. The trial court is, however, free on remand to revisit this issue and determine whether this evidence should be considered as a distributional factor.

V

[5] Finally, we consider Mr. Cochran's argument that the trial court erred by classifying a checking account held in his name only as marital property. As of the date of separation, the parties had two checking accounts: (1) a marital account that had been "divided equally between the parties by stipulation"; and (2) an account solely in Mr. Cochran's name, used by Mr. Cochran after separation, with a value of $3,389.21 at the date of separation.

Under North Carolina law, property acquired "after the date of marriage" and "before the date of separation" is presumed to be marital for the purpose of equitable distribution. N.C. Gen. Stat. § 50-20(b)(1) (2007). To rebut this presumption, the party seeking to classify the property as separate must show, by the greater weight of the evidence, that the property is not marital but separate property, as defined in N.C. Gen. Stat. § 50-20(b)(2). See N.C. Gen. Stat. § 50-20(b)(1).

Here, Mr. Cochran asserts that the only funds transferred into this account were his portion of the funds from the marital joint account that the parties had by agreement split equally during the week they separated. Ms. Cochran, however, presented evidence that the bank account in question was opened on 9 July 2005, five days before the parties separated, with an initial deposit of $4,032.55. Ms. Cochran presented further evidence that the only checks written from the joint account to Mr. Cochran were a check dated 7 July 2005 for $1,000.00 and a check dated 14 July 2005 for $2,100.00. Both checks were made out to "cash." The 14 July 2005 check could not have been the source of funds in the account, since the account balance on 13 June 2005 was $3,389.21. Given this evidence, we hold that the trial court did not err in determining that Mr. Cochran failed to rebut, by the greater weight of the evidence, the presumption that the checking account was marital property. Accordingly, we uphold the trial court's classification of the account.

COCHRAN v. COCHRAN

[198 N.C. App. 224 (2009)]

Affirmed in part; reversed and remanded in part.

Judge ERVIN concurs.

Judge WYNN concurs in a separate opinion.

WYNN, Judge, concurring.

I concur with the majority's holding vacating the trial court's equitable distribution order and remanding for further proceedings. However, I write separately to discourage deviation from the *Bishop* methodology, absent a high level of scrutiny and exacting analysis of the type demonstrated in today's opinion.

In *Bishop*, this Court reviewed different valuation methods developed by "accountants and actuaries and accepted by the courts" and thoughtfully crafted a five-step approach for valuating defined benefit plans. *Bishop*, 113 N.C. App. at 730, 440 S.E.2d at 595. Specifically, the second step of the "*Bishop* method" requires the trial court to "determine the employee-spouse's life expectancy as of the date of separation and use this figure to ascertain the probable number of months the employee-spouse will receive benefits under the plan." *Bishop*, 113 N.C. App. at 731, 440 S.E.2d at 595-96.

In this case, the trial court made the following finding regarding the valuation of Mr. Cochran's pension plan:

7. . . . The court used the following relevant factors when determining the valuation of the plan. The Defendant participant was born on July 26, 1957 and his age at the date of separation was 48.03 years. The Defendant's date of employment, in regards to this plan, was May 28, 1988. As of the date of separation the Defendant has been a participant in the plan for 17.1287 years and was still employed. The earliest retirement age under the plan is 50 years therefore the years to earliest retirement as of the date of separation is 1.97 years. The unreduced monthly benefit as of the date of separation was $1,270. The reduced benefit at earliest retirement is $1016. . . . Using the 94 Group Annuity Reserving Table, which the court finds is an appropriate method of determining life expectancy the court finds that the actuarial present value of the defined benefit plan of $1,016.12 per month beginning on the earliest retirement date of July 25, 2007 is $215,225. . . .

The evidence presented at trial and the resulting findings of fact indicate that, rather than determining a life expectancy and number of

probable months that Mr. Cochran would receive benefits as required by *Bishop*, the trial court adopted the alternative valuation method presented by Plaintiff's expert, Mr. Shriner. By his own admission, Mr. Shriner testified that he did not determine a life expectancy for Mr. Cochran that could be expressed as a number of years. He explained that, rather than using a static calculation of "life expectancy" based on averages, he used actuarial math to determine the probability of mortality. Further, neither the trial court's findings nor Mr. Shriner's testimony offered a probable number of months that Mr. Cochran would receive benefits from his pension plan. Thus, the method used in this case was not the specific method approved by *Bishop*.

Nonetheless, I agree that the method employed by Mr. Shriner, adopted by the trial court, and affirmed by our decision today, was an alternate method that was consistent with *Bishop*. Yet, while it does appear to be reasonable not to be "frozen in 1994[,]" the method prescribed by *Bishop* remains valid. Because "consistency in valuation methods is important," it would be prudent for our trial courts to weigh with great care any efforts to deviate from the specific method prescribed in *Bishop*. *Bishop*, 113 N.C. App. at 731, 440 S.E.2d at 595.